## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

WILLIAM V. AGUIAR, III,

                Plaintiff,

      v.

FLOYD WEBB, BARRON SHEPPARD,
WENDY SHEPPARD and ASHIDO KIM
a/k/a CHRISTOPHER HUNTER and
a/k/a BRADFORD DAVIS,

                Defendants.

Civil Action No. 07-CA-11673-MLW

---

## **DEFENDANT FLOYD WEBB'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Dockets.Justia.com

## I.     INTRODUCTION

Plaintiff William V. Aguiar III ("Aguiar") initiated this action against documentary filmmaker Floyd Webb ("Webb") as part of his campaign to stop Webb from telling the story of Count Juan Raphael Dante, an enigmatic and eccentric martial artist who rose to prominence in Chicago more than forty years ago.  Aguiar has caused two video preview "trail.ers" for the film to be removed (temporarily) from the video-sharing website YouTube, and caused the (temporary) suspension of Webb's website that chronicles the making of his upcoming film.  Aguiar continues that campaign here, seeking a sweeping preliminary injunction against Webb.

Aguiar, however, has not begun to satisfy the heavy burden a party must show to obtain a preliminary injunction especially one that hinders free speech.  He cannot show likelihood of success on the merits because he fails to provide any evidence he owns valid copyright or trademark rights.  Indeed, several of the copyrights he asserts are not registered to him and the trademark registrations he points to are invalid.  Even if Aguiar could show ownership of valid rights, Webb's work is protected by the Fair Use doctrine of copyright law.  Similarly, any use of trademarks in Webb's video trailers, or on his website to chronicle the making of his film, are used in a plainly non-commercial context and do not implicate the source-identification function of trademark law.

Aguiar likewise provides no evidence of the irreparable harm necessary to support a preliminary injunction.  The balance of hardships tilts dramatically in Webb's favor:  his rights to free speech and expression are in jeopardy, as is his ability to finance his film in the shadow of this lawsuit; Aguiar, on the other hand, points to no hardship he will suffer absent the provisional relief he requests, and submits no evidence of any such hardship.  Moreover, Aguiar comes to this Court with unclean hands.  He has misrepresented, under oath, the status of his trademarks.

There is simply no basis for a preliminary injunction here.

## II.    BACKGROUND

### A.    Defendant Floyd Webb And His Work

Defendant Floyd Webb is a documentary filmmaker who resides in Chicago, Illinois.  *See* Declaration of Floyd Webb in Opposition to Plaintiff's Motion for Preliminary Injunction ("Webb Dec.") ¶ 2.  He has produced a variety of documentary and other films, videos and other digital media.  Among other credits, Mr. Webb was the Associate Producer of the feature film *Daughters of the Dust*, and the Chicago Producer of international co-production for the film *The World of Nat King Cole*.  *See id.*  Webb has lectured on African American Cinema History at the School of the Art Institute of Chicago and on Convergence and New Media at the London School of Printing and the Institute of Contemporary Art.  *See id.*

Webb's latest film project is a documentary film entitled, *The Search for Count Dante*. The film explores the life of John Keehan, a martial arts expert who changed his name in the 1960s to Count Juan Raphael Dante.  *See id.* at ¶ 3.  Keehan rose to prominence on the South side of Chicago in the early 1960s as a leading practitioner of the martial arts.  Among other things, Keehan co-founded the United States Karate Association and the World Karate Association.  He also distinguished himself as one of the first American karate masters to accept African-American and Hispanic students.  *See id.* at ¶ 5.

Upon changing his name, Count Dante began promoting himself as the "Deadliest Man Alive" and "Crown Prince of Death."  *See id.* at ¶ 6.  He founded an organization he called the Black Dragon Fighting Society ("BDFS") and advertised heavily in comic books, offering his publication "The World's Deadliest Fighting Secrets" for five dollars. *See id.* According to various press accounts, he was involved in the infamous "Dojo Wars" in which he attacked members of a rival martial arts organization, which resulted in the death of one of his associates. *See id.*  He is also reputed to be involved in the Purolator armored car robbery, one of the most

significant heists in Chicago's history.  *See id.*  All the while, he apparently created hair designs

for Playboy models, kept a baby lion as a pet, and once paid a visit to Muhammad Ali's home to

challenge him to a boxing match.  *See* Declaration of Brandy Karl in Opposition to Motion for

Preliminary Injunction ("Karl Dec.") ¶ 2, Ex. A (*Chicago Reader* Article); Webb Dec. ¶ 6.

Through his interviews of an array of characters, including karate champions, mob

informants and tai chi masters, Webb tells Count Dante's story, set against the backdrop of social

change during the 1960s and '70s and the emergence of martial arts in American popular

consciousness.  *See* Webb Dec. ¶ 4.  Although the full-length film is a work in progress, Webb

has created two trailers (the "Trailers"); each is an approximately ninety second preview of the

full length film to promote and attract support and an audience for his film.  *See id.* at ¶ 7 , Ex. A

(Film Trailer One), and Ex. B (Film Trailer Two).

Webb has also created an extensive website, www.thesearchforcountdante.com (the

"Website").  *See* Webb Dec. ¶ 8.  In addition to watching Trailer One, visitors to the Website can

watch interviews of people in the film, learn more about Count Dante's life, record video

testimonials of their experience with Count Dante's book, read Webb's biography and view his

notes and video clips created in the making of the film.  *See id.*  Visitors are also invited to make

monetary donations to support the film.  *See id.*

### B.    Aguiar's Attempts To Silence Webb's Speech

Shortly before his death in 1975, Count Dante allegedly chose William Aguiar II as his

successor and "Supreme Grand Master" of the Black Dragon Fighting Society.  *See* Webb Dec. ¶

9.  Upon Mr. Aguiar's death in 2005, that title purportedly passed to his son, William Aguiar III,

the Plaintiff in this matter.  *See id.*  Since assuming this role, Aguiar has asserted ownership of

the trademarks and copyrights in a variety of materials, including, "World's Deadliest Fighting

Secrets," "The Count Dante Fighting System," "Black Dragon Fighting Society," "The Count's

Logos," and www.countdante.com. *See id*. at ¶ 10. Aguiar has attempted to prevent Defendant Webb from using in his film any copyrighted or trademarked materials that he claims to own through a series of heavy-handed tactics. Indeed, Aguiar asserts that each "violation" is subject to two million dollars in damages and/or six years of imprisonment. *See id*. at ¶ 11 and Ex. E (Cease and Desist Letter to Network Solutions).

Since learning of Webb's project, Aguiar has attempted to silence Webb at every turn. Aguiar has succeed in temporarily disabling Webb's Website and removing the Trailers from YouTube.

### 1.    Aguiar's Unsuccessful Attempts To Disable Webb's Website

On June 26, 2007, Plaintiff's attorney John Francoeur delivered a cease and desist letter to Network Solutions, the registrar for Webb's domain name (www.thesearchforcountdante.com), which included a notarized affidavit of Plaintiff Aguiar swearing that the Website infringes copyrights and trademarks owned or controlled by Aguiar and/or BDFS. *See* Webb Dec. ¶ 12 and Ex. E.

Days later, on July 10, 2007, Plaintiff's attorney delivered a cease and desist letter to The Planet, the company that hosts Webb's webpage (www.thesearchforcountdante.com) on their servers. This cease and desist letter again included a notarized affidavit of Defendant Aguiar swearing that the Website infringes copyrights and trademarks owned or controlled by Aguiar and/or BDFS. *See* Webb Dec. ¶ 13 and Ex. F (Cease and Desist Letter to The Planet).

In response to Plaintiff's cease and desist letter, The Planet instructed its web hosting company, HostGator, to disable the Website, blocking all public access to the Trailers and all other material on the Website, as well as denying Webb access to files he uploaded and maintained on the Website. This prevented him from working with his collaborators on the film, and disabled his email account. *See* Webb Dec. ¶ 14.

Upon discovering that his Website had been disabled, Webb complained to HostGator's support department and explained that his Website did not infringe Plaintiff's copyrights or trademarks. *See id.* at ¶ 15. After HostGator's support personnel investigated the issue, they sent an email to Webb stating that his account and Website had been reactivated because their investigation revealed that the fair use doctrine clearly protected Webb's use of the Disputed Materials. *See id.*, Ex. G (July 25, 2007 email from HostGator to Floyd Webb). Access to the Website was immediately restored. *See* Webb Dec. ¶ 15.

### 2.    Aguiar's Unsuccessful YouTube Takedowns

In January 2007, Webb uploaded the Trailers to YouTube (www.youtube.com) under his username, archanjo88. *See* Webb Dec. ¶ 16. YouTube is a video-sharing site where millions of Internet users post videos and make them available to others for viewing.

In or about June 2007, Plaintiff Aguiar delivered one or more takedown notices to YouTube pursuant to the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(c). *See* Webb Dec. ¶ 17. In those takedown notices, Aguiar asserted under penalty of perjury that the Trailers infringe copyrights and trademarks owned or controlled by Aguiar and/or BDFS. *See id* Upon receiving this notice, YouTube blocked all public access to the Trailers, substituting in place of the Trailers a notice stating that the videos were no longer available. *See id.* at ¶ 18. On or about June 20, 2007, Webb received two emails from YouTube notifying him that YouTube had blocked the webpages "as a result of a third-party notification by Black Dragon Fighting Society/Count Dante Fighting System claiming that this material is infringing." *See id.* at ¶ 17 and Ex. H (YouTube emails to Webb).

In response to Plaintiff's takedown notices, pursuant to 17 U.S.C. § 512(g)(3), Webb sent YouTube a DMCA counter notification on July 23, 2007. *See* Webb Dec. ¶ 19 and Ex. I

(Counter Notice to YouTube). Upon receiving Webb's counter notification, YouTube restored access to the Trailers on the YouTube website. *See* Webb Dec. ¶ 19.

## III.    ARGUMENT

Aguiar does not come close to discharging the burden he must meet in order to obtain a preliminary injunction. His motion is procedurally defective for lack of notice, or any attempt to comply with the applicable rules. Indeed, he submits no evidence aside from his vague and conclusory affidavit, and fails to even identify the works or conduct he seeks to enjoin. Aguiar cannot show any likelihood of success on the merits, or any basis on which the balance of hardships tips in his favor, and his request for an injunction should be rejected in any event based on his repeated misrepresentations about the status of his supposed trademark rights. His motion for preliminary injunction should be denied.

### A.    Aguiar's Preliminary Injunction Motion Is Procedurally Defective

Aguiar's motion should be denied at the outset because he has not complied with basic procedural requirements. Plaintiff initiated this action with a slim complaint that does not differentiate among the several defendants in this case, fails to identify which rights were infringed by which defendants, or even specify the accused works. Accordingly, it provides Webb with little (if any) notice of the specific allegations against him. *See* Fed. R. Civ. P. 8(a).

Aguiar's Motion for Preliminary Injunction is similarly defective. It does not identify any specific conduct that Plaintiff seeks to enjoin, and it does not provide any evidence whatsoever, much less any that would support an injunction, or even suggest infringement. Indeed, the only thing Plaintiff submits in support of his motion is an affidavit that does little more than repeat the vague and conclusory allegations in his complaint. His motion for preliminary injunction must fail for this reason alone. *See Donnelly v. Boston College*, 401 F. Supp. 1 (D. Mass 1975) (denying injunctive relief where plaintiff, without tendering any

evidence, sought an injunction on the basis of conclusory and speculative allegations in complaint).

Aguiar likewise fails to meet basic procedural requirements. He has not submitted a memorandum setting forth any facts or reasons why his motion should be granted, as required by Local Rule 7.1(B)(1), and likewise has made no attempt to seek a pre-motion conference, as required by Local Rule 7.1(A)(2), which would have been particularly helpful to all parties. While the Court may make certain allowances for a *pro se* litigant, it should not do so at the expense of providing fair notice to the defendants or requiring that Aguiar meet his evidentiary burdens. *See Ahmed v. Rosenblatt*, 118 F. 3d 886, 890 (1st Cir. 1997), (noting that although courts construe *pro se* complaints liberally, "pro se status does not insulate a party from complying with procedural and substantive law").

Webb has been left to piece together for himself the nature of the allegations against him. Accordingly, Webb sets forth his opposition to what he understands to be the basis of Aguiar's preliminary injunction motion.

**B.    Aguiar Does Not Meet The Standards For Issuance Of A Preliminary Injunction.**

In order to obtain a preliminary injunction, the moving party "must establish that (1) it is substantially likely to succeed on the merits of its claim; (2) absent the injunction there is 'a significant risk of irreparable harm'; (3) the balance of hardships weighs in its favor; and (4) the injunction will not harm the public interest." *I.P. Lund Trading ApS, Kroin Inc. v. Kohler Co.,* 163 F. 3d 27, 33 (1st Cir. 1998). In matters pertaining to copyright and trademark infringement, courts apply a modified test focusing on the first and third factors. *See Green Book Intern. Corp. v. InUnity Corp.*, 2 F. Supp. 2d. 112, 124-125 (D. Mass. 1998). The primary consideration is

likelihood of success on the merits. *Id.*; *Tyco Healthcare Group LP v. Kimberly-Clark Corp.*, 463 F. Supp. 2d 127, 131 (2006).

A preliminary injunction is "extraordinary relief" and should not be granted lightly. *Q Division Records LLC v. Q Records, QVC, Inc.*, 2000 WL 294875 at *2 (D. Mass. 2000). Where as here, a "colorable fair use defense" is asserted in defense of a party's free speech rights, a court should be particularly wary of granting a preliminary injunction. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 n. 10 (1994); *Suntrust Bank v. Houghton Mifflin Co.*, 268 F. 3d 1257, 1264 (11th Cir. 2001),

### 1.    Aguiar Cannot Demonstrate A Likelihood Of Success On The Merits.

#### a.    Aguiar Is Highly Unlikely To Succeed On His Copyright Claim Against Webb

Aguiar cannot show any plausible likelihood of success on the merits of his copyright claims. He fails to submit any evidence he owns the copyrights he asserts; indeed, some are registered to other people. That aside, the vast bulk of material Webb used in his Trailers and on his website were drawn from sources in which Aguiar has no plausible copyrights. Even if Aguiar could show he has copyrights in any of the materials Webb uses in his Trailers and on his Website, Webb's use is protected by the fair use doctrine.

##### (1)    Aguiar Provides No Evidence He Owns Any Valid Copyrights

In order to succeed on his copyright infringement claim, Aguiar must first prove he is the owner, or exclusive licensee, of a valid copyright registered with the Copyright Office. 17 U.S.C. §§ 411, 501(b); *see Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340 (1991); *Havens v. Time Warner, Inc.*, 896 F. Supp. 141, 143 (S.D.N.Y. 1995) (dismissing copyright infringement case where plaintiff could not show any evidence that he was

the legal or beneficial owner of an exclusively licensed copyright right). Here, Aguiar presents no such proof.

In his complaint, Aguiar identifies only one registered copyright: HA86679 ("World's Deadliest Fighting Secrets"). *See* Complaint at ¶ 5. Aguiar does not submit a registration certificate to the Court, or any evidence that would suggest he is the owner, assignee or exclusive licensee of this copyright. In fact, this registration is for a copyright in the 1968 booklet "World's Deadliest Fighting Secrets" published and sold by the Chicago BDFS[1] in 1968, and registered in 1969 to "Black Dragon Fighting Society, accepted alternate business designation of Count Dante." *See* Karl Dec. ¶ 3, Ex. B. (U.S. copyright registration number HA86679).

In his affidavit in support of his preliminary injunction motion, Aguiar identifies three more copyright registrations: TX3161682 ("World's Deadliest Fighting Secrets"); PAU2-673-807 ("World's Deadliest Fighting Secrets"); and PAU2-617-092 ("World's Deadliest Fighting Secrets II" / "The Charging T (the Death March)"). Again, Aguiar does not submit registration certificates for these copyrights, or any evidence that suggests he is the owner or exclusive licensee of them. Accordingly, Aguiar present is no evidence that he has any standing to assert any of the registered copyrights he identifies.

Insofar as Aguiar attempts to sue or obtain an injunction on other, unregistered copyrights, he simply cannot do so. The Copyright Act, 17 U.S.C. § 101 *et. seq.*, provides that "no action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a). This requirement is jurisdictional. See *Torres-Negron v. J&N Records*,

---

[1] The Black Dragon Fighting Society run by Count Dante is referred to here as the Chicago BDFS. The organization of the same name operated by William V. Aguiar II and Plaintiff is referred to as the Fall River BDFS.

2007 WL 2846117 at *3 (1st Cir.) (holding District Court lacked jurisdiction over copyright infringement claims where Plaintiff failed to make a complete application for registration).

(2)    **Aguiar Cannot Show Unauthorized Copying Of Any Work In Which Plaintiff Has Plausible Copyrights**

As a documentarian, Webb draws from a variety of sources in his work.  While Webb's Trailers and Website include a variety of images of Count Dante, the vast majority of these images are drawn from sources as to which Aguiar cannot claim any plausible copyrights.

**Still Images.**  The first still image Webb uses in Trailer One is a publicity photo of Count Dante.  *See* Webb Dec. ¶ 20.  That publicity photo was distributed freely by Count Dante in or before 1975 without a copyright notice.  *See id.*  Accordingly, it lost copyright protection by virtue of general publication and entered the public domain.  *See* 17 U.S.C. § 1 *et. seq.* (1909 Copyright Act, repealed effective 1978); *See* 17 U.S.C. § 1 *et. seq.* (repealed effective 1978) ("1909 Copyright Act"); *see generally* 2 Patry on Copyright §§ 6:30-73 ("Patry");.  Five other still images of Count Dante in the Trailers are likewise drawn from publicity photos published in or before 1975 without copyright notices and are also in the public domain by virtue of that fact.  *See* Webb Dec. ¶¶ 23, 25, 28, 32, 36.  Even if those images were under copyright, Aguiar presents no evidence suggesting he is the owner or exclusive licensee of any such copyrights.  Accordingly, no infringement claim can be premised on the use of these publicity photos.

Several other still images Webb uses in the Trailers and Website are taken from comic books, newspapers and magazines.  *See id*. at ¶¶ 22, 26, 29, 31, 41.  Another is from a program for a karate tournament, while still another is taken from Count Dante's high school yearbook.  *See* Webb Dec. ¶¶ 24, 30.  The copyrights in these images would presumably lie with the publisher of these publications, or the material would be in the public domain. See Moger v. WHDH, Inc., 194 F. Supp. 605 (D. Mass. 1961) (finding that lack of proper notice on individual

10

contribution to collective work gave rise to no copyright in the individual contribution); *see generally* Patry § 6:43.  In any event, Aguiar again presents no evidence that suggests he is the owner or exclusive licensee of these images, and neither his infringement claims nor his requested injunction can be premised on them.

Four images used in the Trailers are drawn from the 1968 publication "World's Deadliest Fighting Secrets."  *See* Webb Dec. ¶¶ 27, 34, 37, 45.  While Aguiar asserts he is the owner of the copyrights in this work, it was originally registered to "Black Dragon Fighting Society, accepted alternate business designation of Count Dante," not Aguiar, and Aguiar presents no evidence that suggests he is the owner or exclusive licensee of this copyright.

**Video Footage.**  Webb's Trailer One, *see* Webb Dec., Ex. A, also uses one segment of video footage of Count Dante, which appears at the very beginning.  *See* Webb Dec. ¶ 21.  In this footage, we see Count Dante performing his infamous "Dance of Death."  This footage was apparently shot by John Creeden II in or before 1975 (the year Count Dante died).  *See id.*  Aguiar presents no evidence it is under copyright at all.  Indeed, if it were published prior to 1978 without a copyright notice, it would have fallen immediately into the public domain. *See generally* Patry § 6:36.  Even if it were under copyright protection, Aguiar again presents no evidence he is the owner or exclusive licensee of those copyrights.  In any event, this footage was licensed expressly for use Webb in Webb's film by John Creeden II through his son, John Creeden III, who accepted $1000 in exchange for this license.  *See* Webb Dec. ¶ 21.

       (3)    **Even If Webb Had Used Copyrighted Material Belonging To Aguiar, The Fair Use Doctrine Would Protect Webb's Use**

Inasmuch as Defendant Webb has used *any* materials over which Aguiar might exercise valid copyrights, Webb's use of this material is protected by the Fair Use doctrine –  an "integral part" of the Copyright Act designed to protect expression like Webb's.  P. Leval, *Toward a Fair*

*Use Standard*, 103 Harv. L. Rev. 1105, 1107, 1110 (1990).

The constitutional directive that animates copyright law is to "promote the Progress of Science and the Useful Arts." U.S. Const. art. I, § 8, cl. 8. Accordingly, the "primary objective of the Copyright Act is to encourage the production of original literary, artistic and musical expression." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533-34 (1994). Copyright law accomplishes this goal by providing authors with exclusive rights for limited times. Fair use, however, places important limits on those exclusive rights insofar as they might impede certain forms of free expression. Indeed, fair use is a "First Amendment safeguard" that is designed to prevent copyright law from unduly burdening free speech. *Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003).

The fair use inquiry is typically guided by the four non-exclusive factors set out below. *See* 17 U.S.C. § 107; *Campbell*, 510 U.S. at 579 (1994). No one factor is controlling; all must be "weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578.

**The Purpose And Character Of The Use.** The first factor of the fair use analysis is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107. "The focus of this analysis asks whether the new work merely 'supersedes the objects' of the original creation or instead adds something new." *Núñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 21-22 (1st Cir. 2000), *quoting Campbell*, 510 U.S. at 579). A "transformative" work is one that uses the original work to create "new expression" or new meaning, with a "further purpose of different character." *Campbell*, 510 U.S. at 579. "The more 'transformative' the new work, the less the significance of factors that weigh against fair use, such as use of a commercial nature." *Id.*

Using copyrighted material to illustrate a biographical work is highly transformative, and

the right to do so is well established. *See Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006) (holding fair use protects publisher's right to use copyrighted concert posters to illustrate biographical work documenting 30 year history of the Grateful Dead) (citing cases). The law recognizes biographical works as "forms of historic scholarship, criticism and comment that require incorporation of original source material for optimum treatment of their subjects." *Id.*; *see* 17 U.S.C. § 107. This protection is not limited to the print medium. The right to use copyrighted material in biographical contexts applies with equal force in regard to audio-visual works. *See Hofheinz v. A&E Television Networks*, 146 F.Supp. 442 (S.D.N.Y. 2001) (fair use protects right to use clip from motion picture in television biography of actor); *Monster Communications v. Turner Broadcasting System, Inc.*, 935 F.Supp. 490 (S.D.N.Y. 1996) (recognizing fair use right to use 14 historic film clips in television documentary about Muhammad Ali).

Here, Webb's work is highly transformative. In his Trailers, he uses artifacts from Count Dante's life to piece together a snapshot of the man, his nature, the things he did, and the life he lived. Its additional purpose is to introduce the audience to the forthcoming feature documentary about Count Dante, which will delve deeper into Count Dante's life, and tell his story through the people who knew him. Similarly, the website is designed to convey information about the film biography underway. Webb's biographical purpose is sharply different from the original purpose of the allegedly copyrighted material. The World's Deadliest Fighting Secrets booklet was presumably designed to teach martial arts skills; advertisements for it from comic books were presumably intended to sell more booklets. Webb, by contrast, has recast that material and used it in a new and creative story that pieces together the biographical elements of Count Dante's life. Accordingly, the first fair use factor weighs heavily in Webb's favor.

**The Nature Of The Copyrighted Work.** The second factor in the fair use inquiry is "the nature of the copyrighted work." 17 U.S.C. § 107(2). Under this factor, creative works, which are at the core of copyright's protection, receive broader protection; factual works are given correspondingly less weight. *See Núñez*, 235 F.3d at 23, *citing Harper & Row*, *Publishers, Inc. v. The Nation Enters.* 471 U.S. 539, 563-64. Copyrighted material that requires skill to produce, like photographs, but which is not an artistic representation designed primarily to express ideas, emotions or feeling but instead for publicity, are neutral on this creativity spectrum. *See Núñez*, 235 F.3d at 23 (finding that the second factor weighed in favor of newspaper's use of unpublished but disseminated publicity photos). The nature of the copyrighted materials used by Webb, is more factual than the pictures used in Nunez: they illustrate and advertise Count Dante's fighting techniques and convey factual information, not the "ideas, emotions, or feelings" of the author of the works. *See Id.*

Even if the copyrighted works at issue were creative in nature, this factor still weighs in Webb's favor. Although the protection of creative works is a "core concern" of copyright protection, the transformative use of even a creative work supersedes the copyright owner's stake in this second factor. *See Bill Graham Archives,* 448 F.3d at 612-613 (holding that the transformative use emphasizing the historical nature of creative concert posters limits the weight of this factor). Webb's transformative use of the copyrighted materials to illustrate the biography of Count Dante tilts this factor in favor of fair use.

**The Amount and Substantiality Of The Portion Used In Relation To The Copyrighted Work As A Whole.** The third fair use factor is the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). Courts must be flexible with this inquiry and discount this factor when the nature of a copyrighted work

demands use of all, or nearly all, of the work. *See Núñez*, 235 F.3d at 24 (finding that copying less than the entire picture would have made it useless to the story). Wholesale copying is sometimes necessary in order to document historical events and to provide context to the story being told through the transformative use of creative works. *See Bill Graham Archives,* 448 F.3d at 613.

Providing context to his biography of Count Dante is exactly what Webb seeks to accomplish. The Trailers and Website intermingle the copyrighted material with other visual works, text, quotations, and original graphic art, limiting the visual impact of the copyrighted works and recontextualizing them in the framework of the documentary story. *Cf. Bill Graham Archives,* 448 F.3d at 613. Webb would be unable to conjure the subjects and topics of Count Dante's biography without the use of these images. The third factor is therefore of "little consequence" to the analysis. *See Núñez*, 235 F.3d at 25.

**The Effect Of The Use Upon the Potential Market For And Value Of The Copyrighted Work.** The fourth factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). To determine whether the fourth factor weighs in favor of finding a fair use, courts must consider the market harm caused by the infringement and whether the potential market would be damaged if a use similar to the infringement were to become widespread. *See Harper & Row*, 471 U.S. at 568. Plaintiff has submitted no evidence to show any market for the copyrighted works at all, much less any *harm* to that market.

On the contrary, Aguiar cannot show harm to any relevant market. It is implausible to suggest that Webb's work is a potential substitute for Aguiar's booklets and videos designed to teach martial arts skills, or that Webb's work will in any way "supersede" the market for such

works.  *See Campbell*, 510 U.S. at 579.  If anything, it may increase the demand for Aguiar's booklets and videos.  *See Núñez*, 235 F.3d at 24-25.  While Aguiar may argue that Webb's work might affect markets for derivative works, "the focus of the fourth factor is limited to the "impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets." *Bill Graham Archives*, 448 F.3d at 614.  Copyright holders are not allowed to foreclose fair use by creating licensing markets for transformative uses of copyrighted material.  *See id.* Accordingly, where an accused infringer's work falls into a "transformative market" the copyright holder suffers no cognizable market harm.  *See id.* at 615.  Here, Webb's use is highly transformative, and the only effect his use would have would be in the "transformative market." Accordingly, the fourth factor weighs in Webb's favor.

### b.    Aguiar Is Highly Unlikely To Succeed On His Trademark Infringement Claims

To succeed on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1051, *et. seq*.,  Plaintiff must show that (1) he uses, and thereby 'owns,' a mark; (2) that the defendant is using the same or a similar mark; and (3) that the defendant's use is likely to confuse the public.  *Alta Vista Corp., Ltd. v. Digital Equipment Corp.*, 44 F. Supp. 2d 72, 76 (D. Mass. 1998).  Here, Plaintiff owns no registered marks related to this action.  Moreover, it is clear that to the extent Defendant has used any disputed mark, such use was non-commercial fair use and completely unlikely to cause confusion.  As such, Plaintiff has no likelihood of prevailing on an infringement claim.

### (1)    Aguiar Does Not Own The Marks In Dispute

In his affidavit, Plaintiff claims ownership in two trademarks, "The Count Dante Fighting Systems" and "The Black Dragon Fighting Society."  In fact, Plaintiff owns neither.  These marks were registered on March 14, 2000 to a William V. Aguiar, presumably Plaintiff's father.

However, they were canceled on December 16, 2006. *See* Karl Dec., Ex. C (PTO record of canceled "Black Dragon Fighting Society" mark), and Ex. D (PTO record of canceled "Black Dragon Fighting Society" mark). Plaintiff subsequently attempted to register them in his own name, by filing new applications. On April 27, 2007, he filed an application to register "The Black Dragon Fighting Society" mark. This application was refused in a non-final action on August 13, 2007. *See id*., Ex. E (PTO record of application to register "Black Dragon Fighting Society" mark). Plaintiff filed an application to register "The Count Dante Fighting System" on July 13, 2007. *See id*., Ex. F (PTO record of application to register "Count Dante Fighting System DAN-TE" mark). This application has not yet been assigned to an examiner. *See id*., Ex. F. Thus, Plaintiff's affidavit in support of the present motion, which asserts that he is "the owner of . . . trademarks issued by the U.S. Trademark Office" is disingenuous at best. *See also* p. 20, below.

Plaintiff does not hold any valid registration and can bring no claim for infringement under 15 U.S.C. § 1114. Nor can Plaintiff assert common law rights under 15 U.S.C. § 1125(a), because there is no proof that his use of any mark has acquired secondary meaning. *Wiley v. American Greetings Corp.*, 762 F. 2d 139, 141 (1st Cir. 1985).

### (2)    Webb's Use Of Trademarks Is Non-Commercial Fair Use

Even assuming Plaintiff held any valid trademark rights, the holder of a trademark does *not* acquire the exclusive use of said mark in every context, but rather only "the right to prevent the goods to which the mark is applied from being confused with those of others and to prevent his own trade from being diverted to competitors." *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F. 2d 26, 29 (1st Cir.), *cert. denied*, 482 U.S. 1013 (1987); *see also WCVB-TV v. Boston Athletic Ass'n*, 926 F. 2d 42, 45 (1st Cir. 1991) (A trademark holder does not have "any 'property right'

in [his] mark *except* 'the right to prevent confusion'") (emphasis in original).   Because expanding the reach of the Lanham Act beyond this limited scope "might intrude on First Amendment values," the Court must construe trademark law narrowly to avoid such an intrusion. *Rogers v. Grimaldi*, 875 F. 2d 994, 998 (2d Cir. 1989).

First Amendment considerations are of particular relevance where the accused use of the mark is non-commercial. In order for the use of a mark to be infringing, it must be a *commercial* use.   *L.L. Bean, Inc.*, 811 F. 2d at 29 ("the sweep of a trademark owner's rights extends only to injurious, unauthorized *commercial uses* of the mark by another") (emphasis in original).   The use of a mark is non-commercial, and therefore "the First Amendment is implicated," when it "is part of a communicative message" as opposed to acting as a "source identifier" for products. *Mattel, Inc. v. MCA Records, Inc.*, 296 F. 3d 894, 900 (9th Cir. 2002), *cert. denied*, 537 U.S. 1171 (2003); *Yankee Publishing Inc. v. News America Publishing Inc.*, 809 F. Supp. 267, 276 (S.D.N.Y. 1992).   Where a mark is being used for the purposes of art, parody, criticism, news reporting, commentary, comedy or allusion, it is a non-commercial use.   *L.L. Bean, Inc.*, 811 F. 2d at 32-34; *Yankee Publishing Inc.*, 809 F. Supp. at 276.   Put simply, "trademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view."   *L.L. Bean, Inc.*, 811 F. 2d at 29.

Here, Plaintiff appears to complain of Defendant Webb's use of a name and logo of the "Black Dragon Fighting Society."   This mark was part of a vintage advertisement in comic books in the 1960's and 1970's promoting how-to martial arts products once sold by Count Dante. Defendant Webb is not selling similar how-to products, competing products, or services of any sort.   *See* Webb Dec. ¶ 47.   Rather, Webb's use of the advertisement in his film is to describe Count Dante's historical impact on martial arts in the popular consciousness.   Similarly, Webb

uses the comic book ad on his Website to solicit public comments about the history and impact of Count Dante's products. *See* Karl Dec., Ex. G (Printout of Webb's Website).  Webb's use of the mark is for purposes of comment, criticism and artistic expression but *not* to identify the source of goods sold by Webb.

Although Webb may one day derive revenue from his film, his use of the mark itself remains non-commercial.  In *L.L. Bean*, the First Circuit held that the critical use of a company's logo in a magazine article was non-commercial fair use, even though the magazine itself was sold for profit.  *L.L. Bean, Inc.*, 811 F. 2d at 32; *see also Universal Comm. Systems v. Lycos, Inc.*, 478 F. 3d 413, 415-416 (1st Cir. 2007) (use of company logo to describe subject matter of Internet discussion boards was non-commercial even though website contained ads).  In other words, the relevant question is not whether the defendant profits by way of its critical or artistic expression, but whether the mark is used to identify the source of competing products or services.  *See Universal Comm. Systems*, 478 F. 3d at 424, *citing L.L. Bean, Inc.*, 811 F. 2d at 32; *see also Bosley Medical Inst., Inc. v. Kremer*, 403 F.3d 672, 679 (9th Cir. 2005).

(3)    **Webb's Use Of Any Trademark Is Unlikely To Cause Confusion**

The key element of any trademark infringement is consumer confusion – that is consumers are likely to be confused as to the source of goods.  *Purolator, Inc. v. EFRA Distributors, Inc.*, 687 F. 2d 554, 559 (1st Cir. 1982).  Here, Aguiar presents no evidence of any such confusion, or any facts that would suggest it.

**C.    The Balance Of Harms Weighs In Favor Of Webb**

In balancing harms, the Court should "consider the potential legitimate harm to the defendant[] owing to the injunction as balanced against the degree of plaintiff's likelihood of success on the merits." *Fritz v. Arthur D. Little, Inc.*, 944 F. Supp. 95, 97-98 (D. Mass. 1996)

19

(denying motion for injunction in trademark matter).  Here, Plaintiff's likelihood of success is slim at best*, see* pp. 8-18, above, while the potential harm to Plaintiff is extreme.  An injunction preventing Webb from any fair use of the disputed material would stop the production of his film dead in its tracks, prevent Webb from exercising his free speech and artistic expression, and cause the film to be left out of film festivals and to be excluded from other promotional opportunities.  *See* Webb Dec. ¶ 50.

D.    **The Motion For Preliminary Injunction Should Be Denied Because Plaintiff Has Unclean Hands**

The doctrine of unclean hands bars equitable relief when a party participates in inequitable misconduct related to the controversy at issue.  *See Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945).  The issuance of a preliminary injunction is an equitable remedy, and those who seek it must do so with clean hands.  Here, Plaintiff has materially misrepresented to this Court the status of the trademarks at issue by failing to mention the he is merely an applicant, not a registered mark holder.  *See* p. 16, above.

This is not the first time Plaintiff has concealed the true legal status of the disputed marks.  In support of his attorney's cease and desist letter to Network Solutions, Plaintiff proffered an affidavit, dated June 22, 2007, *see* Webb Dec., Ex. E, wherein he claimed ownership of the "Black Dragon Fighting Society" mark and avowed that the mark was "in full force and effect."  *See id.*  As proof of this status, Plaintiff attached to his affidavit Trademark Applications and Registration Retrieval ("TARR") data from the Patent and Trademark Office.  *See id.*  An up-to-date TARR printout would have revealed the canceled status of the mark, so instead Plaintiff attached an out-of-date printout indicating that the mark was still registered.  Given that the mark had been cancelled six months earlier, and that Plaintiff had attempted to register it again in his own name only two months prior to signing the affidavit, *see* p. 16, above,

it is highly unlikely that this was an honest mistake. Plaintiff's misconduct in this case is highly troubling and because Plaintiff comes to this Court with unclean hands, the Court should deny the requested relief.

## IV.     CONCLUSION

Plaintiff's Motion for a Preliminary Injunction should be denied.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), defendant Floyd Webb hereby requests oral argument on

Plaintiff's motion for preliminary injunction.

Dated: October 12, 2007
Stanford, California

Respectfully submitted,

FLOYD WEBB,

By his attorneys,

/s/ Brandy A. Karl
Brandy A. Karl (BBO #661441)
Lawrence Lessig (*pro hac vice* admission pending)
Anthony Falzone (*pro hac vice* admission pending)
Julie Ahrens (*pro hac vice* admission pending)
Center for Internet and Society
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305-8610
bkarl@stanford.edu
Tel: (650) 724-0517

and

Michael Boudett (BBO # 558757)
David Kluft (BBO # 658970)
Walead Esmail (BBO # 666347)
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210

*Attorneys for Defendant Floyd Webb*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and a paper copy was sent to those indicated as non registered participants on October 12, 2007.

/s/ Brandy A. Karl
Brandy A. Karl