UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIAM V. AGUIAR, III, and the
BLACK DRAGON
FIGHTING SOCIETY,

                Plaintiff,

   v.

FLOYD WEBB,

               Defendant.

Civil Action No. 07-CA-11673-MLW

### MEMORANDUM IN SUPPORT OF
### DEFENDANT FLOYD WEBB'S 12(b)(6) MOTION TO DISMISS

Defendant Floyd Webb moves to dismiss the Second Amended Complaint in the above-captioned matter in its entirety and with prejudice, on the grounds that Plaintiff has not and cannot sufficiently allege ownership of the copyrights at issue, and because he cannot make out a case under M.G.L. c. 214 § 3A.

**I.    Facts**

Defendant Webb is an independent filmmaker who has made two trailers in order to raise funds for and awareness about his upcoming documentary, "The Search for Count Dante," a biography of the legendary martial artist John Keehan a/k/a Count Dante. Plaintiff, William V. Aguiar III ("Mr. Aguiar" or "Aguiar III"), has brought suit for copyright infringement based on Mr. Webb's inclusion in the trailers of two items: (1) a piece of film footage (the "Footage") depicting Count Dante performing the "Dance of Death" and (2) photographs from Count Dante's 1968 book, "World's Deadliest Fighting Secrets" (the "1968 Book"). Mr. Aguiar also asserts that Mr. Webb has violated M.G.L. c. 214 § 3A because William V. Aguiar Jr. ("Aguiar II"), his father, appears in the Footage as Count Dante's sparring partner.

A.  The Film Footage

Mr. Aguiar's Second Amended Complaint alleges that in 1973, Count Dante and Aguiar II performed the "Dance of Death" fighting technique in front of a motion picture camera, leading to the creation of the Footage.[1] (Second Amended Complaint ("Complaint") at ¶ 20). Plaintiff alleges that Count Dante was a "prominent figure" and "pioneer in the field of mixed martial arts" and describes the Footage as an "extremely rare" filmed demonstration of "Count Dante's own unique defense form." (Complaint at ¶ 20). Twenty-eight years later, in 2001, Aguiar II and Aguiar III somehow acquired and incorporated the Footage into a compilation "video" of martial arts demonstrations. (Complaint at ¶ 20). Mr. Aguiar alleges that Aguiar II subsequently filed for and was granted copyright registration in a compilation "film."[2] (Complaint at ¶ 21).

It is not disputed that Defendant Webb used a portion of the Footage in one of the trailers for his biographical documentary about Count Dante. That trailer, as well as a still image of the portion of the trailer containing the Footage, is already before the Court.[3] In the trailer, the Footage runs for approximately fifteen seconds as part of a collage of images. The Footage appears in the background, with a photograph of Count

---

[1] Defendant assumes for purposes of this motion only that the second person in the Footage is Aguiar II.

[2] The Second Amended Complaint does not actually allege that the Footage is part of whatever work was ultimately copyrighted. Presumably, Mr. Aguiar means to allege that the copyrighted "film" (Complaint at ¶¶ 21-22) is the same as the "video" containing the Footage (Complaint at ¶ 19), and thus the copyrighted "film" contained the Footage as well. However, the Second Amended Complaint does not allege that fact. Nevertheless, the present motion does not hinge on this point.

[3] See Docket #22 and Exhibit J to Docket #21. The trailer is also available at http://www.youtube.com/watch?v=mN1_2kz1SCE and at http://thesearchforcountdante.com/html/seetrailer_lorez11_07.htm.

Dante in the foreground.[4] The Footage is also obscured in part by the text of a quotation by Count Dante. Although perhaps it can be inferred that one of the fighters is Count Dante, the other fighter is not mentioned or identified explicitly or by inference. The faces of both fighters are washed out and barely visible.

   1.   *Plaintiff's previous statements about the ownership of the Footage*

Mr. Aguiar has on several occasions stated and avowed that the Footage belongs to someone else, namely his friend, John Creeden III ("Creeden III"), and his friend's father, John Creeden Jr. ("Creeden II"). Mr. Aguiar has declared under penalty of perjury that "Mr. [Creeden II] shot the film in 8mm format . . . in the [] early seventies" and that the Footage is "exclusively owned by [Creeden II]." Docket # 42, ¶ 21. Moreover, Mr. Aguiar acknowledges that Mr. Webb obtained the footage from the Creedens and in fact paid the Creedens. Docket # 42, ¶ 21; see also, e.g., docket ##s 26, 41, 56, 70, 74, 96.[5]

   2.   *Plaintiff's current allegations about ownership of the Footage*

The Second Amended Complaint addresses only the alleged ownership of a 2001 compilation containing the Footage. It does not allege who shot the Footage of Count Dante in 1973, who had possession of the Footage between 1973 and 2001, and most critically, who owns the copyright to it.

---

[4] Mr. Aguiar does not claim rights to the photograph. See Docket #42, ¶20.

[5] Defendant recounts Plaintiff's earlier statements not because this motion depends on factual inconsistencies in his various submissions to this Court, but rather to provide context to the deficiencies of the Second Amended Complaint. Plaintiff's earlier statements about a third party's ownership of the Footage shed light on his present failure to allege that he is the owner. These statements demonstrate that the current omissions are not mere scrivener's errors that can be cured by a third amended complaint. Rather, they reveal fatal flaws at the heart of Plaintiff's present case, i.e. that he cannot allege in good faith that he is the owner of the intellectual property in dispute.

B.  The 1968 Book

Plaintiff alleges that in approximately 1968, Count Dante authored the 1968 Book, entitled "World's Deadliest Fighting Secrets." (Complaint at ¶ 10). In 1969, Count Dante registered the 1968 Book as Copyright No. A86679, in the name of the Black Dragon Fighting Society ("BDFS"), Count Dante's accepted alternative business designation. (Complaint at ¶ 14). Plaintiff alleges, and it is not disputed, that Mr. Webb used images from the 1968 Book in his trailer, and that he used an image of the cover of the Book on his website.

  1.  *Plaintiff's previous submissions about the ownership of the 1968 Book*

In earlier phases of this case, Mr. Aguiar wove an elaborate story about the chain of title to the 1968 Book. See, e.g., docket ##s 42, 70, 87. According to Mr. Aguiar's submissions, Count Dante retained personal ownership of the copyright and did business as the "Black Dragon Fighting Society" until his death in 1975, when copyright ownership passed to his widow, Christa Sikes, or a corporation controlled by Sikes. Mr. Aguiar submitted a document allegedly signed by Sikes and purporting to transfer the copyright from "Cherry Productions, Inc. d/b/a Black Dragon Fighting Society" to a Rhode Island corporation called the House of Dante in 1977. See docket # 70-2, p. 20.

From the House of Dante, the copyright purportedly passed to Aguiar II as an individual, or to an organization called the BDFS in Massachusetts and then to Aguiar II. Mr. Aguiar sought to prove the various links in this chain with articles from Black Belt Magazine and other documents which made no mention of the copyright to the 1968 Book. E.g., docket # 70-3. For the final link in the chain, from Aguiar II to Aguiar III, Plaintiff submitted a Petition he had filed in the Probate Court in January, 2008 (months after this lawsuit was initiated and three years after Aguiar II's death) requesting that the

administration of Aguiar II's estate be reopened so as to include the copyrights, which Plaintiff represented to the Probate Court were not included in the earlier administration because of "inadvertence or mistake." See docket # 70-2, pp. 1-2.

    *2.    Plaintiff's current allegations about the ownership of the 1968 Book*

Mr. Aguiar's Second Amended Complaint omits any discussion of Sikes, Cherry Productions, or the House of Dante. It does not mention the 1977 transfer or inheritance of the copyright from Aguiar II. Instead, it alleges a sparse alternative tale whereby Count Dante authored the 1968 Book and then simply "moved" the BDFS to Fall River in the early 1970's. Thereafter, Count Dante allegedly "passed control and directorship" of the BDFS to his "protégé," Aguiar II, who upon his death in 2005 was succeeded as "Grand Master" by Aguiar III. (Complaint at ¶¶ 15, 25). The Second Amended Complaint alleges no other facts regarding ownership of the 1968 Book or the transfer of Copyright No. A86679.[6]

Moreover, the Second Amended Complaint does not specify whose copyrights have been infringed by Mr. Webb's use of the 1968 Book. Rather, it vaguely alleges that the use infringes copyrights "owned and controlled by Aguiar III ***and/or*** the Black Dragon Fighting Society," who Mr. Aguiar now asserts is an independent plaintiff in this action. (Complaint at ¶ 27) (emphasis added).

---

[6] Mr. Aguiar also mentions a 1991 revision of the 1968 Book, registered by Aguiar II. (Complaint at ¶ 18). This revision allegedly included additional text and new photographs of the "Poison Hand" technique. (Complaint at ¶ 18). Plaintiff does not allege that Mr. Webb used any of this revised material, and Mr. Aguiar has previously avowed that all the material used by Mr. Webb was in the original 1968 Book. See docket # 42. Therefore, the allegations regarding this revision are superfluous. Aguiar II's editorial revisions do not afford him any rights in the original work. See Spillman v. Mosby-Yearbook, Inc., 115 F. Supp. 2d 148, 153 (D. Mass. 2000) (authorship "consisting of editorial revisions, annotations, elaborations, or other modifications" does not extend to ownership in the original work) (citing 17 U.S.C. §§ 103, 106).

## II. Argument

### A. Applicable Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff's pleadings "must possess enough heft to show that [he is] entitled to relief." Clark v. Boscher, 514 F. 3d 107, 112 (1st Cir. 2008). The Court accepts as true "well-pleaded facts," but the plaintiff must rely on more than unsupported conclusions. Id. Rather, his "factual allegations must be enough to raise a right to relief above the speculative level." Parker v. Hurley, 514 F. 3d 87, 95 (1st Cir. 2008). Therefore, "dismissal for failure to state a claim is appropriate if the complaint fails to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gagliardi v. Sullivan, 513 F. 3d 301, 305 (1st Cir. 2008).

Although documents not included in the original pleading ordinarily cannot be considered on a motion to dismiss for failure to state a claim, there are exceptions for documents the authenticity of which is not disputed, for official records, for documents central to plaintiff's claims and for documents sufficiently referred to in the complaint. Parker, 514 F. 3d 87 at 91 n. 1. In particular, cases brought under M.G.L. c. 214 § 3A are commonly decided on motions to dismiss for failure to state a claim where, as here, the allegedly offending use of the plaintiff's name or picture is already before the Court. See Tropeano v. The Atlantic Monthly Company, 379 Mass. 745, 751 (1980) (affirming 12(b)(6) dismissal of M.G.L. c. 214 § 3A claim based on use of photograph in magazine article); Amrak Productions, Inc. v. Morton, 321 F. 2d 130, 134 (D. Mass 2004), aff'd, 410 F. 3d 69 (1st Cir. 2005) (dismissing M.G.L. c. 214 § 3A claim based on use of photograph in biographical work).

B. <u>Mr. Aguiar's copyright claims fail because he does not allege ownership</u>

Mr. Aguiar's copyright infringement claim is based on Mr. Webb's use of the Footage and photographs from Count Dante's 1968 Book in a trailer for his upcoming biographical documentary. It is axiomatic that in a copyright infringement action, the plaintiff must allege and prove his ownership of the copyright to the creative work in question. <u>Mag Jewelry Co. v. Cherokee, Inc.</u>, 496 F. 3d 108, 114 (1st Cir. 2007). "The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C.S. § 103. Here, Mr. Aguiar has failed to allege ownership of copyright in either the Footage or in the 1968 Book.

As to the Footage, all that the Second Amended Complaint alleges is that Plaintiff somehow succeeded to a copyright in a compilation that contains the Footage. Plaintiff has not alleged ownership of a copyright in the Footage itself (presumably because he still thinks that his friends, the Creedens, own it), or for that matter any of the preexisting material included in the compilation.[7] The Second Amended Complaint alleges only that the Footage came into existence, that Aguiar II somehow acquired it and used it in a compilation 28 years later, and that the compilation was subsequently registered as an independent work. Because Mr. Aguiar does not allege that he owns copyright to the

---

[7] Additionally, even if ownership of the compilation had any independent significance here, Mr. Aguiar has not alleged that he owns the copyright to that either. He alleges only that Aguiar II registered the compilation as an individual, and that Aguiar III succeeded Aguiar II as "Grand Master." The Second Amended Complaint does not allege that Aguiar III inherited the copyright from Aguiar II, it does not allege alternatively that the copyright passed to the BDFS as a corporate entity, and it does not even allege who holds that copyright today.

Footage, he has failed to state a claim for copyright infringement.

As to the 1968 Book, nowhere in the Second Amended Complaint does Mr. Aguiar state that either he or the putative plaintiff BDFS owns that work or any of its constituent parts. Rather, the Second Amended Complaint asserts that Count Dante is the author, and that BDFS was the "accepted alternate business designation of Count Dante." Plaintiff then asserts that Mr. Aguiar succeeded Count Dante and Aguiar II as "Grand Master" of an organization called the BDFS. There are no other allegations regarding ownership of the 1968 book except the conclusory assertion that Aguiar II "and/or" the BDFS owns the copyright today. This is inadequate to state a claim.

As a preliminary matter, identifying something as an "alternative designation" is not to allege its existence as a separate entity, but is merely an indication that Count Dante was "doing business as" the "Black Dragon Fighting Society". See 17 USCS § 401(3). Therefore, Mr. Aguiar's admission that BDFS was a mere "alternative designation" of Count Dante is fatal to his copyright claim over the 1968 Book. There is no allegation that Mr. Aguiar inherited any copyright from Count Dante himself. Also conspicuously absent is any allegation that Count Dante ever conveyed copyright no. A86679 to any entity entitled BDFS. Moreover, Mr. Aguiar does not allege whether, when and how the BDFS came into existence as a separate entity apart from Count Dante.[8] Instead, the Second Amended Complaint alleges only that Count Dante "moved the [BDFS] from Chicago, Illinois to Fall River, Massachusetts, and . . . passed control

---

[8] Nor does the Second Amended Complaint allege what kind of entity the BDFS is today, such that it has standing to bring legal action. Defendant notes as a matter of public record that the only entity by that name registered in Massachusetts was formed in 1987 and involuntarily dissolved in 1990. See
http://corp.sec.state.ma.us/corp/corpsearch/CorpSearchSummary.asp?ReadFromDB=True&UpdateAllowed=&FEIN=000249397.

and directorship of the [BDFS] to his protégé," Aguiar II. No effort whatsoever is made to explain the ownership or chain of title to the intellectual property at issue in this case.

Mr. Aguiar's evasive posture towards ownership of the disputed materials is no accident. Mr. Aguiar presumably has realized that he cannot prove, or even assert in good faith, either the simple fact of his ownership or the complex chain of title he proffered earlier in the case. Therefore, he has constructed something in between, a nebulous co-plaintiff of unexplained origin called the BDFS. He covers the gaping holes in his earlier story by alleging that the BDFS simply "moved" to Fall River in the early 1970's, where Aguiar II and Aguiar III in succession attained the prestigious-sounding but legally insignificant title of "Grand Master." Mr. Aguiar then accuses Mr. Webb of violating a copyright whose ownership allegedly exists somewhere in the hazy penumbra between Aguiar III "**and/or**" the BDFS. If either one of these plaintiffs actually owned a copyright in either work at issue in this case, it would be a simple matter to plead as much. Instead, Mr. Aguiar is engaged in a shell game.

C. <u>Defendant's use of the Footage does not violate M.G.L. c. 214 § 3A</u>

Mr. Aguiar asserts that Mr. Webb has violated Massachusetts General Laws c. 214 § 3A because Aguiar II allegedly appears in the Footage as Count Dante's sparring partner. M.G.L. c. 214 § 3A imposes liability for the unauthorized use of a plaintiff's "name, portrait or picture" for "advertising purposes or for purposes of trade." Mr. Aguiar claims that Mr. Webb's use of historically significant footage of Count Dante fighting someone he alleged is Aguiar II violates the statute. This position is untenable under both the statute itself and under the First Amendment principles that have guided its interpretation.

Courts have long recognized that a cause of action for misappropriation of a

likeness must be tempered by considerations of free speech. Old Colony Donuts, Inc. v. American Broadcasting Companies, Inc., 368 F. Supp. 785, 788 (D. Mass. 1974) ("defendants' First Amendment privilege would override any cause of action under the Massachusetts statute")[9]; see also Dallesandro v. Henry Holt and Co., Inc., 166 N.Y.S. 2d 805, 806 (N.Y. App. Div. 1957) (New York statute similar to M.G.L. c. 214 § 3A imposes no liability for items that are matters of "public interest");[10] Comedy III Productions Inc. v. Gary Saderup Inc., 25 Cal. 4th 387, 396 (2001) (applying First Amendment principles to California right of publicity statute); Restatement (Third) of Unfair Competition § 47, cmt. c (1995) ("the right of publicity as recognized by statute and common law is fundamentally constrained by the public and constitutional interest in freedom of expression").

In Tropeano v. The Atlantic Monthly Co., the Supreme Judicial Court distinguished between uses that exploit the commercial value of a person's name or picture and uses "for purposes other than taking advantage of his reputation, prestige or other value associated with him for purposes of publicity." 379 Mass. 745, 749 (1980). The Court called the latter category "incidental use." Id. (citing Restatement (Second) of Torts § 652C, cmt. d (1977)).[11] In making this distinction, the Court sought to ensure that

---

[9] The same concern was expressed by the Supreme Judicial Court even before M.G.L. c. 214 § 3A came into existence. Themo v. The New England Newspaper Co., 360 Mass. 54, 58 (1940) (newspaper may publish photograph of plaintiff speaking with police after being robbed because it was a matter of public interest).

[10] Although Dallesandro and its progeny articulate a broad free speech exception to the New York right of publicity, the Supreme Judicial Court has stated that M.G.L. c. 214 § 3A is to be interpreted even more narrowly than its New York counterpart so as to avoid impinging upon the territory protected by the First Amendment. Tropeano v. The Atlantic Monthly Co., 379 Mass. 745, 747-48 (1980) (quoting Time, Inc. v. Hill, 385 U.S. 374, 381-82 (1967)).

[11] The cited comment states: "*Incidental use of name or likeness*. The value of the

(Footnote Continued on Next Page.)

M.G.L. c. 214 § 3A was not misinterpreted so as to "authorize a remedy against the press and other communications media which publish the names, pictures, or portraits of people without their consent." Tropeano, 379 Mass. at 747. The Court further stated that an incidental use is not converted into an advertising or trade use merely because the vehicle in which plaintiff's picture appears is sold for profit. Id. at 751.

Incidental use includes the use of a plaintiff's image to illustrate the contents of a piece of legitimate First Amendment expression. For example, in Tropeano, the plaintiff's image was used along with a series of other images to illustrate a magazine article on a subject of sociological interest, even though plaintiff had no connection to the subject matter of the article. Id. at 726. The Court found that this use was incidental and not for purposes of advertising or trade. Id. at 750-51 (affirming allowance of motion to dismiss). Similarly, in Morrell v. Forbes, Inc., the use of an image of the plaintiff fisherman catching crabs to illustrate a magazine story about the involvement of organized crime in the fishing industry was incidental to the story. 603 F. Supp. 1305, 1307 (D. Mass. 1985). Here, Mr. Webb's use of fifteen seconds of film showing a public figure fighting with another person who is alleged to be Aguiar II as the background for

---

(Footnote Continued from Previous Page.)

plaintiff's name is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities; nor is the value of his likeness appropriated when it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity. No one has the right to object merely because his name or his appearance is brought before the public, since neither is in any way a private matter and both are open to public observation. It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded. The fact that the defendant is engaged in the business of publication, for example of a newspaper, out of which he makes or seeks to make a profit, is not enough to make the incidental publication a commercial use of the name or likeness. Thus a newspaper, although it is not a philanthropic institution, does not become liable under the rule stated in this Section to every person whose name or likeness it publishes." Restatement (Second) of Torts § 652C, cmt. d (1977).

other images is clearly a use "for purposes *other than* taking advantage of [Aguiar II's] reputation, prestige or other value associated with him for purposes of publicity." Tropeano, 379 Mass. at 749.

The case for First Amendment protection is even stronger when the use of the plaintiff's name or picture is in association with a subject of public interest in which the plaintiff was involved. For example, in Amrak Productions, Inc. v. Morton, 321 F. 2d 130, 133 (D. Mass 2004), aff'd, 410 F. 3d 69 (2005), a former bodyguard sued the publisher of a biography of the singer Madonna for use of a photograph depicting the plaintiff and Madonna together. The Court granted the defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), noting that such publication fell "squarely" into the category of incidental use. Id. at 139-40. Indeed, the use of names and pictures in biographical works is considered universally to be "outside the scope of the publicity right." Restatement (Third) of Unfair Competition § 47, notes to cmt. c (1995); see also Seale v. Gramercy Pictures, 949 F. Supp. 331, 336 (E.D. Pa. 1996) (use of name and image of Bobby Seale in docudrama about Black Panthers); Shubert v. Columbia Pictures Corp., 72 N.Y.S. 2d 734, 742 (1947) (use of name of theatre owner in connection with biographical film of Al Jolson). This same principle applies even where, as here the plaintiff is not the focus of the biographical work. Amrak Productions, Inc., 321 F. 2d at 133; see also Williams v. Newsweek, Inc., 63 F. Supp. 2d 734, 735 (E.D. Va. 1999) (use of image of plaintiff in biographical work about the person seated next to plaintiff in photograph not actionable under Virginia statute with language nearly identical to M.G.L. c. 214 § 3A); Restatement (Second) of Torts § 652C, illus. 9 (1977) ("A writes and publishes an autobiography in which at several points, he names B as one of his friends. This is not an invasion of B's privacy.").

Moreover, a plaintiff cannot circumvent the protection offered by the incidental use exception simply by bringing an action based on a trailer or other promotion of the protected work. Where a work is entitled to First Amendment protection, said protection extends to promotional materials as well. Amrak Productions, Inc., 321 F. 2d at 140 (use of photograph from book in materials promoting book equally incidental); see also Velez v. VV Publishing Corp., 524 N.Y.S. 2d 186, 187 (N.Y. App. Div. 1988) (use of photograph from newspaper article to promote newspaper circulation not actionable); see also, Ruffin Steinback v. De Passe, 82 F. Supp. 2d 723, 731 (E.D. Mich 2000) (use of names and likenesses on promotional material for biographical mini-series not actionable).[12] In Lemerond v. Twentieth Century Fox Films Corp., 2008 U.S. Dist. LEXIS 26947 at *2 (S.D.N.Y. March 31, 2008), this principle was applied to a movie trailer for the film *Borat*, which contained a clip from the film featuring an unauthorized depiction of the plaintiff. The Court stated that "the mere fact that defendants are spurred by the profit motive and engaged in the commercial exploitation of [a] motion picture does not negate their right to depict a matter of public interest or to advertise the picture by the showing of a 'trailer.'" Id. at *7 n. 1 (quoting Man v. Warner Bros., Inc., 317 F. Supp. 50, 52 (S.D.N.Y. 1970) (pictures of plaintiff in documentary not actionable)).

Here, it is undisputed that Mr. Webb is making a biographical documentary film about a person and activity of legitimate public interest. The use of the image in question is clearly illustrative of that story, and not for the purpose of exploiting the commercial

---

[12] See also Restatement (Third) of Unfair Competition § 47, cmt. a (1995) ("use of a person's identity in news reporting, commentary, entertainment, or works of fiction or nonfiction is not ordinarily an infringement of the right of publicity . . . Use of the person's identity in advertising or promoting such uses is also not actionable").

value of Aguiar II's name or picture.[13] The possibility that Mr. Webb may one day see a profit from the film, and the fact that the Footage is used in a trailer to raise money for the film, do not diminish Mr. Webb's First Amendment protection or take his work outside the incidental use exception. As a matter of law, Plaintiff can prove no set of facts by which this Court could impose liability under M.G.L. c. 214 § 3A.[14]

---

[13] Defendant also notes that the use must "be sufficient to identify the person whose identity the defendant is alleged to have appropriated." Restatement (Third) of Unfair Competition § 46, cmt. d (1995). Although this is normally treated as a question of fact, no reasonable fact finder could find that Aguiar II was identified or identifiable in Mr. Webb's use of the Footage.

[14] In addition, Defendant is aware of no authority supporting the proposition that the right of publicity can be inherited in Massachusetts, and the plain language of the statute fails to provide for post mortem rights. See M.G.L. c. 214 § 3A; Restatement (Third) of Unfair Competition § 46, cmt. h (listing Massachusetts as among the states that still do not provide for post mortem rights); c.f. Comedy III Productions, Inc. v. Gary Saderup, Inc., 25 Cal. 4th 387 (2001) (right of publicity not inheritable under California common law but post mortem rights explicitly provided by statute).

**III.     Conclusion**

For the foregoing reason, defendant Webb requests that this Court dismiss the Second Amended Complaint in its entirety, with prejudice and award such other relief as the Court deems just.

        FLOYD WEBB,

        By his attorneys,

        /s/ David A. Kluft
        Brandy A. Karl (BBO #661441)
        Lawrence Lessig (*pro hac vice*)
        Anthony Falzone (*pro hac vice*)
        Julie Ahrens (*pro hac vice*)
        Center for Internet and Society
        Stanford Law School
        559 Nathan Abbott Way
        Stanford, CA 94305-8610
        bkarl@stanford.edu
        Tel:  (650) 724-0517

and        Michael Boudett (BBO # 558757)
        David Kluft (BBO # 658970)
        Walead Esmail (BBO # 666347)
        Foley Hoag LLP
        155 Seaport Boulevard
        Boston, MA 02210

        *Attorneys for Defendant Floyd Webb*

Dated: June 6, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system on June 6, 2008 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

        /s/ David A. Kluft
        David A. Kluft