1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3                              No. 1:07-cv-11673-MLW

4

5
    WILLIAM V. AGUIAR, III,
6              Plaintiff

7
    vs.
8

9
    FLOYD WEBB, et al,
10             Defendants

11

12                       * * * * * * * * *

13

14                      For Hearing Before:
                    Chief Judge Mark L. Wolf
15

16                       Motion Session

17
                     United States District Court
18                   District of Massachusetts (Boston)
                     One Courthouse Way
19                   Boston, Massachusetts 02210
                     February 15, 2008
20

21                       * * * * * * * *

22
                 REPORTER: RICHARD H. ROMANOW, RPR
23                    Official Court Reporter
                   United States District Court
24         One Courthouse Way, Room 5200, Boston, MA 02210
                     bulldog@richromanow.com
25

1                    A P P E A R A N C E S

2

3    WILLIAM V. AGUIAR, III
         630 Maple Street
4        Fall River, Massachusetts 02720
         (508) 678-5310
5        Pro Se Plaintiff

6

   ANTHONY T. FALZONE, ESQ.
7    JULIE A. AHRENS, ESQ.
         Center for Internet and Society
8        Stanford Law School
         559 Nathan Abbott Way
9        Stanford, California 94305
         (650) 736-9050
10       Email: Falzone@stanford.edu
   and
11   DAVID A. KLUFT, ESQ.
         Foley Hoag, LLP
12       155 Seaport Boulevard
         Seaport World Trade Center West
13       Boston, Massachusetts 02210
         (617) 832-3092
14       Email: Dkluft@foleyhoag.com
         For Floyd Webb

15

16   AMY L. BROSIUS, ESQ.
         Fish & Richardson
17       225 Franklin Street
         Boston, Massachusetts 02110-2804
18       (617) 521-7066
         Email: Brosius@fr.com
19       For Radford Davis

20

   AARON Y. SILVERSTEIN, ESQ.
21   ARPIAR M. SAUNDERS, ESQ.
         Saunders Silverstein & Booth, LLP
22       172 State Street, Suite 3
         Newburyport, Massachusetts 01950
23       (978) 463-9130
         Email: Asilverstein@ssbooth.com
24       For Barron and Wendy Shepherd

25

1      P R O C E E D I N G S

2           (Begins, 2:00 p.m.)

3           THE CLERK:  Civil Action, 07-11673, William

4    Aguiar versus Floyd Webb, et al.  The Court is in

5    session.  You may be seated.

6           THE COURT:  Good afternoon.  Would those

7    present to participate please identify themselves for

8    the Court and for the record.

9           MR. AGUIAR:  Your Honor, I'm William Aguiar,

10   I'm the plaintiff.

11          MR. FALZONE:  Good afternoon, your Honor.

12   Anthony Falzone for defendant, Floyd Webb.  With me here

13   is Julie Ahrens and David Kluft.

14          MS. BROSIUS:  Your Honor, Amy Brosius for the

15   defendant, Radford Davis.

16          MR. SILVERSTEIN:  Your Honor, Aaron

17   Silverstein and Matthew Saunders for the defendants,

18   Barron and Wendy Shepherd.

19          THE COURT:  Okay.  I want to review the

20   pending motions which I'm prepared to address and, I

21   expect, decide today.

22        First, is the motion to dismiss for lack of

23   personal jurisdiction and for other reasons filed by

24   Barron Shepherd, Wendy Shepherd and Radford Davis, also

25   known as Ashida Kim.  I want to confirm, however, that

while Floyd Webb has asserted a lack of personal jurisdiction as an affirmative defense, he's not moved for dismissal now for lack of personal jurisdiction or for any other reason, is that correct?

MR. FALZONE:  That's correct, your Honor.

THE COURT:  Now, Mr. Aguiar, I ordered Mr. Davis to file a consolidated motion to dismiss and ordered you to respond to that by last Monday, February 11th.  No response was filed, however.  I know you're representing yourself, but you're obligated to obey court orders and if you don't, I have the authority, which I may be compelled to exercise in the future, to dismiss your case.  Do you understand that?

MR. AGUIAR:  Your Honor, I understand.  I was hoping to get that out actually in the next couple of days and --

THE COURT:  You were hoping to do what?

MR. AGUIAR:  I was hoping to send it out in the next day or two, unfortunately, I just couldn't get to finish it up.  I also would like to ask for a continuance at this time for 90 days.  I've been interviewing some counsel and the attorney asked me to ask for a 90-day extension and that way he can review the case.  His name is Attorney Richard Goren.

THE COURT:  Okay.  Well, that request is

1   denied.  As you can see, there's been a proliferation of

2   filings, I've set this hearing, everybody's come.

3   Although -- and my goal is to decide these matters

4   today.  If you or Mr. Goren had filed a motion before we

5   got here, I could have decided what to do.  But if this

6   all comes out in accordance with my present views, it

7   may be that Mr. Goren can look at this, if he files an

8   appearance, and rehabilitate the case somewhat.  But

9   it's just not the way it works.

10          MR. AGUIAR:  Okay, your Honor.  I only really

11  attained him within the last couple of days and he said

12  he couldn't be here, that if he could, he would of, and

13  so he asked me to do this.

14          THE COURT:  Well, that's okay.  But, you know,

15  you filed this case a long time ago, a lot of filings

16  have been made, I understand a lot of e-mails have been

17  exchanged, and now I'm going to decide as much as I can

18  properly decide today and we'll see what's left and

19  where we go from here.

20          MR. AGUIAR:  Okay, your Honor.

21          THE COURT:  And just in case, you know, you

22  continue to represent yourself, but this is also true

23  for any attorney who represents you, as I said, you have

24  to obey the court orders and you should get a copy of

25  the Federal civil rules and the court's local rules.

1    For example, the local rules require that you file a
2    memorandum in support of any motion you file, like your
3    motion for a preliminary injunction, but you didn't do
4    that.
5        All right.  Let me ask you this.  You didn't file
6    any opposition to the consolidated motion to dismiss
7    that Mr. Davis, through his counsel, filed.  Do you
8    oppose that motion?
9            MR. AGUIAR:  To consolidate?
10           THE COURT:  No, do you oppose Mr. Davis'
11   motion to dismiss even though you didn't file an
12   opposition?
13           MR. AGUIAR:  Yes.
14           THE COURT:  All right.  So I've got the
15   motions to dismiss based primarily, but not exclusively,
16   on lack of personal jurisdiction.  If those defendants
17   are dismissed, I still have Mr. Aguiar's motion for a
18   preliminary injunction with regard to Mr. Webb, I have
19   Mr. Aguiar's motion to amend to add 3-1 Studios in which
20   Webb is allegedly a partner, and I have some other
21   motions.  I think those are the substantive motions
22   other than the schedule and the protective order, is
23   that right?  There are a few other motions that I'll
24   deal with as a housekeeping matter.
25           (Pause.)

1    THE COURT:  I have the Shepherds' motion for

2    leave to file a reply brief, which is allowed, and

3    Mr. Aguiar's motion to amend the Copyright Office

4    document, which I think doesn't require any action by

5    me.  But to the extent he's amending anything that was

6    filed in court, that's allowed.

7         Mr. Aguiar's discovery motions are premature and

8    they're denied as premature.  Mr. Davis' motion for

9    inclusion in the proposed hearing, where he wanted to

10   participate by telephone, is now moot.  Mr. Collins

11   filed a motion seeking leave to act as an amicus

12   curiae.  The arguments he presents seem to be factual,

13   rather than legal, and I don't perceive that anybody

14   needs any help in this case, or at least the defendants

15   don't.  So that's denied.

16        Mr. Aguiar moved to strike one of Mr. Davis'

17   previous motions, but that motion has been -- well,

18   Mr. Davis' motion has been withdrawn, so the motion to

19   strike is moot.  And scheduling, as I said, and the

20   protective order, we'll decide -- we'll discuss later.

21        Now I've got the three motions to dismiss for lack

22   of personal jurisdiction.  The usual prima facie

23   standard is a standard I intend to apply.  That means:

24   "The personal jurisdiction must be based on evidence of

25   specific facts set forth in the record.  The plaintiff

must go beyond the pleadings and make affirmative
proof.  The plaintiff may not rely on unsupported
allegations to make a prima facie showing of personal
jurisdiction."  I read that from *Boit*, 967 F. 2nd 671 to
675.

It seems to me that all of the moving defendants
have meritorious motions to dismiss, but that if I allow
the motions to dismiss, it may be without prejudice.
You know, conceivably if a new lawyer comes in and
proper allegations of personal jurisdiction can be made,
I would consider it.  On the other hand, if there's
another motion to amend and there's not a proper factual
basis, sanctions can be imposed, like money, sanctions,
under Federal Rule of Civil Procedure 11 for making
baseless claims.  But in any event, I'm interested in
hearing the argument, of course, before finally deciding
this issue, which I have studied.

So which of the defendants -- and we'll go
defendant by defendant, would like to go first?  As far
as I can see -- and when I say "see," usually I look at
the complaint and I look at affidavits.  Since
Mr. Aguiar is Pro Se and representing himself, I've
looked at all the filings.  But I can't find any
allegations relating to Wendy Shepherd in those
filings.  There are some regarding Barron Shepherd and

1   there are some regarding Mr. Davis.

2        Do the defendants have a preference as to who goes

3   first?

4             MS. BROSIUS:  Your Honor, good afternoon.  I'm

5   Amy Brosius here for defendant, Radford Davis.  As your

6   Honor noted, plaintiff's complaint does leave, um, many

7   question marks over what exactly he is alleging our

8   client, Radford Davis, has done and given that, it's a

9   little difficult to address the elements for personal

10  jurisdiction, but to the best we can infer, it doesn't

11  appear that any of the actions the plaintiff is alleging

12  were committed by our client could be considered to

13  arise here in the District of Massachusetts.

14       You know, to the extent our client operates a

15  website, that is true, and it operates two websites,

16  that is a fact, but there's nothing in our complaint

17  that indicates that any of the activity that has been

18  done by our client currently is in any way impacting or

19  coveting work that Mr. Aguiar does own or is alleged to

20  own.  So for that reason we would submit that personal

21  jurisdiction on our client, Mr. Davis, is simply not in

22  the evidence.

23            THE COURT:  Well, I think, liberally

24  construed, the complaint and other documents allege that

25  Mr. Davis infringes the copyright by selling books and

1  videos containing copyrighted material through his

2  website, but I think you provided a declaration, an

3  affidavit saying that everything sold in

4  Massachusetts -- well, your client sold $267 worth of

5  goods in Massachusetts or --

6          MS. BROSIUS:  Sales, in the last two years.

7          THE COURT:  And that's sales generally?

8          MS. BROSIUS:  Exactly.

9          THE COURT:  Or is it sales of the matters

10  relating to Count Dante?

11          MS. BROSIUS:  No, and actually none of the --

12  there has been no sales of anything that could colorably

13  be considered a copyrighted work owned by plaintiff

14  since as far as we can tell.  And obviously our client

15  contests the right of plaintiff over these materials,

16  namely the original Count Dante Fighting Secrets Book,

17  by which we believe was published back in the 1960s.

18  That is the only material that our clients have ever

19  handled.  So as far as the personal jurisdiction

20  question as far as what our claims are doing today in

21  his website?  None of the materials that's been sold in

22  Massachusetts is anything but our client's own authored

23  material.

24          THE COURT:  And, Mr. Aguiar, would you like to

25  speak to the evidence that's in the record with regard

1   to personal jurisdiction over Mr. Davis?

2           MR. AGUIAR:  Yes, your Honor.  Your Honor,

3   regarding the copyrighted works, Radford Davis, Ashida

4   Kim, he basically cuts off my "World's Deadliest

5   Fighting Secrets," the original text and the '91 copy,

6   and uses it -- and also books called "Ninja Hands of

7   Death," and uses pieces of this throughout other books.

8   He also has videos where he does what's copyrighted by a

9   book, "The World of Dance of Death," which is comprised

10  of 27 moves all executed within 5 seconds or so.

11          THE COURT:  Is this in the papers you've

12  submitted to me?

13          MR. AGUIAR:  Yes, I believe it is.  I also

14  have the original copyright.

15      Your Honor, regarding the copyright, what

16  essentially happened is my father had everything turned

17  over to him through the original copyright owner, John

18  Creeden, and later on, with a few letters of transfer of

19  copyright, to his wife.  From there he recopyrighted it

20  in 1986, okay, "The World's Deadliest Fighting Secrets,

21  II."

22          THE COURT:  I'm sorry.  I couldn't hear you.

23          MR. AGUIAR:  From there he recopyrighted in

24  1986.

25          THE COURT:  What did he copyright?

1          MR. AGUIAR:  "The World's Deadliest Fighting

2     Secrets," your Honor.

3          THE COURT:  "The World's Deadliest Fighting

4     Secrets."

5          MR. AGUIAR:  Yes, sir.  In fact, there was an

6     attachment to an amendment -- I believe it was an

7     attachment.  Do you mind if I --

8          THE COURT:  Okay.

9          (Pause.)

10          MR. AGUIAR:  I have my DVDs and things, also,

11     in that case.  I have the original copyright --

12          THE COURT:  Well, is that something you

13     submitted to me previously?

14          MR. AGUIAR:  Yes, your Honor.  I also have the

15     attachment in here.  And basically it states that we

16     have full use of the books and in the back it's actually

17     -- we attached original copyrighted works.

18          THE COURT:  All right.  Let me ask you this,

19     because it's probably a link that would have to be

20     filled in later.  I don't think it's in what you

21     submitted to me.  And my understanding is that your

22     father had the copyright until he passed away a couple

23     of years ago?

24          MR. AGUIAR:  But I received it through

25     probate, your Honor.

1          THE COURT:  You did?

2          MR. AGUIAR:  Yes, sir.

3          THE COURT:  Because at some point there'll

4   have to be some evidence.

5          MR. AGUIAR:  That was also submitted in the

6   paperwork.

7          THE COURT:  I don't think so.

8          MR. AGUIAR:  Sorry?

9          THE COURT:  I don't think so.

10         MR. AGUIAR:  With that being said, I inherited

11  it through will in probate.  Since the '80s -- although

12  this, I believe, this goes back to '05, he's been

13  selling these books.

14      In 2005, your Honor, and shortly after my father

15  passed away, Ashida Kim put on his website and a few

16  other affiliate websites that somebody put him in charge

17  essentially of selling the book that I own.

18         THE COURT:  Where is that in the materials

19  that have been submitted to me?

20         MR. AGUIAR:  Well, offhand, I'm not sure

21  exactly where --

22         THE COURT:  I don't think it's in there.  I

23  mean, these are -- and I can't decide this case based on

24  what, you know, you just start telling me now, which

25  your adversaries haven't had notice of, although, as I

1  said, if I dismiss this case, I may dismiss it without

2  prejudice.  So if there's a proper basis for the case to

3  go forward here in Massachusetts, um, and some lawyer

4  can lay it out in a way that meets the legal standards,

5  then maybe you can get them back in the case.  But go

6  ahead.

7  　　　　　MR. AGUIAR:  Your Honor, essentially I put --

8  filed a DMCA takedown and had his website removed, okay,

9  and that's in the paperwork.  From there I --

10  　　　　　THE COURT:  Who had his website removed?

11  　　　　　MR. AGUIAR:  I did, your Honor, through using

12  his web server and things.  From there I --

13  　　　　　THE COURT:  What do you mean you had it

14  removed?

15  　　　　　MR. AGUIAR:  I filed a DMCA takedown and got a

16  complaint for copyrights and I removed it.

17  　　　　　THE COURT:  With YouTube?

18  　　　　　MR. AGUIAR:  No, with this actual website.

19  The YouTube issues come later on.

20  　　　　　THE COURT:  Okay.

21  　　　　　MR. AGUIAR:  This goes back to the website.

22  From there he sent -- after sending some paperwork and

23  remodifying his website to get his website back, he

24  removed -- I'm sorry, "The World's Deadliest Fighting

25  Secrets Book" and "Ninja Hands of Death, essentially to

1    --

2         THE COURT:  I think you're talking a little

3    too fast and the transcript is probably not going to

4    reflect the names of the books.  They're very familiar

5    to you, but they're not as familiar to the court

6    reporter.

7         MR. AGUIAR:  Okay.  Essentially what happened

8    is I filed the DMCA.  They took it down.  In order for

9    Radford Davis to put his website back up, he had to

10   remove all the copyright infringement issues, anything

11   that I complained about, pretty much.  I think there

12   were about two or three that I wasn't sure about and

13   they let it happen.  But there was paperwork submitted,

14   how he had said he'd never ever use that book again or

15   sell any parts of these books.

16       A few years afterwards he started to sell the book

17   again.  I got in touch -- or shall I say Mr. Webb got in

18   touch with me about the same time, okay, um, and he

19   started selling his books over the website.  His books

20   are also in every major bookstore in Massachusetts.

21            THE COURT:  Whose books?

22            MR. AGUIAR:  Ashida Kim.

23            THE COURT:  Where's that in the papers in

24   front of me?

25            MR. AGUIAR:  I believe they're in there.

1    THE COURT:  Well, show me.

2    MR. AGUIAR:  To tell you the truth, your

3  Honor, I'm not too sure.

4    THE COURT:  Yeah, I'm not too sure either.  I

5  have no evidence of this that I'm aware of.  Go ahead.

6    MR. AGUIAR:  Okay.  I apologize.  That is

7  true.

8         Essentially these are major bookstores in

9  Massachusetts.  Um, he continues to sell the books or at

10  least did for a while and over the last year or so --

11  and this is where the YouTube thing comes in, your

12  Honor, he started using video footage from my disks in

13  some black belt memberships in black belt magazines --

14  not magazines, but black belt memberships to the

15  organization.  I also have submitted diplomas that he's

16  issued out to people utilizing my copyrighted logos.

17    THE COURT:  Diplomas?  Do you have copies of

18  what you gave me?

19    MR. AGUIAR:  Yes.

20    THE COURT:  No, not copies.  Do you have

21  copies of the papers that you filed with the court?

22    MR. AGUIAR:  Some of them, your Honor.

23    THE COURT:  You're going to have to point me

24  -- if I've overlooked something that you gave me

25  previously, then I want to see it.

1        MR. AGUIAR:  Okay.

2        THE COURT:  If it's not in what you gave me

3   previously, I'm not going to rely on --

4        MR. AGUIAR:  I believe that these are within

5   some of the amended things.

6        THE COURT:  What you do you mean by the

7   amended things?

8        MR. AGUIAR:  One the amended filings that I

9   amended with all the other paperwork that I might have

10  missed.

11      Right here is a copy of a diploma.  You'll notice

12  my logo there, also.

13       THE COURT:  Well, I can't see it.  What

14  document do you say you gave me this with?

15       MR. AGUIAR:  Off the top of my head, I'm not

16  sure, your Honor.  I have the document right here.

17       THE COURT:  Do defense counsel -- is this

18  diploma in the record?  Why don't you show it to

19  Mr. Davis' lawyer.

20       (Shows.)

21       MS. BROSIUS:  I don't recall seeing this

22  particular piece.  I can certainly help to maybe fill in

23  a little bit about the dealings between my client and

24  Mr. Aguiar back in --

25       THE COURT:  Well, not yet.

1          MS. BROSIUS:  All right.

2          (Pause.)

3          THE COURT:  Okay.  Go ahead.  Is the logo

4     registered as a trademark in copyright?

5          MR. AGUIAR:  It was registered.  I wasn't able

6     to file my affidavit of continuous use.  I was going

7     through some family matters.  My father had gotten sick

8     and passed away and I was dealing with the repercussions

9     to that.  I had a separation from my ex.  A lot of the

10    paperwork I wasn't able to actually obtain and see the

11    dates and so it slipped out of use, but I had refiled

12    for it and it's pending right now.  I have an office

13    action on it.

14         THE COURT:  See, this is part of the reason it

15    has to be in the papers, so then the other side knows

16    what you're arguing and they can say, "Yes, that's true"

17    or "Here, this shows it's not true."

18         MR. AGUIAR:  I understand, your Honor.  To the

19    best of my ability, I thought it was in there.

20         THE COURT:  Go ahead.

21         MR. AGUIAR:  So essentially, your Honor, in

22    2005, he did that, I took down his website, these other

23    things transpired.  They started selling memberships

24    through YouTube or at least advertising for Black Dragon

25    Fighting Society memberships using my video footage and

```
 1    things along those lines pretty much.  They -- we -- I
 2    used a DMCA takedown again with YouTube.  It turns out
 3    that at the time the accounts that were registered to
 4    the YouTube videos were actually under "Bad Ass
 5    Fightware" and Barron Shepherd.  When we further found
 6    and looked up who the company belonged to and who it was
 7    associated with, your Honor -- and I know this is going
 8    off a little bit to the side, it was registered all
 9    under Wendy Shepherd and that's how I included her,
10    because really she's the business owner of that whole
11    operation with the website and all of that.
12              THE COURT:  These are the type of things that
13    have to be spelled out in a complaint.
14              MR. AGUIAR:  I think they are, your Honor.
15              THE COURT:  No, they're not.  They're not.
16    They're not.  They have to be spelled out -- hold on
17    just a second.
18              (Pause.)
19              THE COURT:  Okay.  This is jumping around a
20    little bit, but it may make it more understandable to
21    me.
22              MR. AGUIAR:  Yeah, I apologize, your Honor,
23    but it kind of all connects.
24              THE COURT:  I mean, this says:  "Wendy
25    Shepherd is an owner of Shepherd's Consulting, Bad Ass
```

1    Fightware.com, Sky Systems, Dojo Press, Dojo Press I, is

2    a resident of Florida."  It doesn't tell me anything

3    about her having registrations or whatever you just

4    talked about.  And I'm explaining this to you because if

5    you get a lawyer, your lawyer should know this, but will

6    have to comply, and if you don't get a lawyer and you

7    try to bring any of these people back in, you're going

8    to have to comply by alleging specific facts that are

9    sufficient, if you can support them, to show that any

10   claim you have against them can properly proceed in the

11   District of Massachusetts as opposed to someplace else.

12   Go ahead.

13            MR. AGUIAR:  So we got him videos, that's how

14   he -- how Mr. Shepherd got involved with all of this

15   stuff.  We sent these out to YouTube, they removed it,

16   they said the next step to keep the videos off is

17   essentially -- we got them the Ashida Kim videos, were

18   to file in Federal court in 10 days, but I couldn't do

19   that because I didn't have the means.  So the videos

20   went back up, I came to court, and I believe I filed on

21   July 7th, and, um, regarding the videos, there were a

22   few videos that were actually recorded, but they used

23   bits and pieces of advertisement, but essentially that's

24   how Mr. Shepherd got involved.

25            The -- like I said before, a lot of the books that

he still sells have remnants of this -- I think there's a book out there called "Book of the Ninja." There's a few that have -- we issued some of the "Dance of Death" moves -- actually, it's the whole "Dance of Death" and he just -- he just keeps putting it in. So if I don't get this book down, it pops up over here. It's all over the place now with his books.

Essentially he says there's seven sales in Massachusetts. I'm not sure if I --

THE COURT: Are you talking about Mr. Shepherd or Mr. Davis?

MR. AGUIAR: Mr. Davis. I'm not sure if that's to be true or not. I do know whether or not I put it in the record or not of the book -- of the book stores, but I could have sworn I did. Um, I don't think there's -- basically he's been doing this a while. And even after, in some of the letters, when I took down his '05 website, website '05, saying he would never use the books again, never use these things again, and they were all back up again after a year and a half.

Essentially I feel that if it goes on, he's just going to continue to stand on my rights and stuff.

THE COURT: Okay. So that's Mr. Davis. Why don't I hear from counsel for the Shepherds and then you'll get a chance to respond to that.

1    MR. SILVERSTEIN:  Good afternoon, your Honor.

2    THE COURT:  Could you please say your name for

3    the record, there's so many attorneys here.

4    MR. SILVERSTEIN:  Aaron Silverstein for Barron

5    and Wendy Shepherd.

6    THE COURT:  Go ahead.

7    MR. SILVERSTEIN:  Your Honor, the plaintiffs

8    failed to allege any facts that would confer to this

9    court personal jurisdiction over Barron and Wendy

10   Shepherd.  Neither Barron nor Wendy Shepherd have ever

11   been to Massachusetts, they do not do business in

12   Massachusetts, they have no bank accounts in

13   Massachusetts, nor do they own any real property or

14   other assets in the Commonwealth.

15   Mr. Shepherd's sole contact with Massachusetts was

16   in the Spring of 2007 when he purchased certain film

17   footage known as "The Dance of Death" film from a

18   Mr. John Creeden, Jr., through his son, John Creeden,

19   III.  Mr. Shepherd did not transact any business with

20   the plaintiff.  In fact, the plaintiff has not put forth

21   any evidence that he has any claim whatsoever to the

22   ownership of the "Dance of Death" film or the copyright

23   of it.  By all accounts, the film was created solely by

24   Mr. Creeden, Jr. and the rights in the film were never

25   licensed, assigned or otherwise transferred to the

plaintiff.

Mr. Aguiar has failed to allege that the Shepherds have performed any specific acts with respect to the "Dance of Death" film or had any contact with the Commonwealth, beyond this single transaction with Mr. Creeden, that would establish specific jurisdiction in the Commonwealth.  Moreover, Mr. Shepherd's single transaction with Mr. Creeden does not constitute continuous and systematic business contacts required to establish general jurisdiction.  Your Honor, jurisdiction is also improper in this case under the Massachusetts long-arm statute.  Jurisdiction generally cannot be premised on a single transaction with the Commonwealth.

THE COURT:  What case do you rely on primarily for that?

MR. SILVERSTEIN:  For the long-arm statute?

THE COURT:  Well, the long-arm statute has four sections, so it's Section 3(a) provides long-arm jurisdiction for the -- for actions arising from a person transacting any business in the Commonwealth.

MR. SILVERSTEIN:  Your Honor, for the long-arm statute, we rely on **Whittaker Corp. v. United Aircraft** and **Automatic Sprinkler Corp. v. Seneca.**  For the general jurisdiction, I would rely on **Sandstrom v. Law**

*Corp.*

Your Honor, Wendy Shepherd has not conducted any business in Massachusetts. In fact, Mrs. Shepherd has had absolutely no contacts within the Commonwealth. Barron Shepherd was involved in a single transaction with Mr. Creeden and sent payment to Mr. Creeden for the "Dance of Death" footage.

THE COURT: Doesn't the -- what about the -- doesn't the information before me show that Mr. Shepherd had some telephone calls or e-mails with Mr. Aguiar?

MR. SILVERSTEIN: I believe so, your Honor, very early on in the process of trying to acquire some of -- some information about Count Dante, they did have communications.

THE COURT: Well, so those are contacts that could contribute to a finding of personal jurisdiction.

MR. SILVERSTEIN: Your Honor, I believe those contacts amounted to a series of e-mails and maybe a phone call. But the vast majority of communication between -- regarding the single transaction was with Mr. Creeden and Mr. Shepherd.

THE COURT: Okay.

MR. SILVERSTEIN: In the plaintiff's opposition to our client's motion to dismiss, the plaintiff claimed that Mr. Shepherd waived personal

1    jurisdiction by filing a counternotification pursuant to

2    the notice and takedown provisions of the Digital

3    Millennium Copyright Act.  Your Honor, neither Mr. nor

4    Mrs. Shepherd has ever filed a DMCA counternotification

5    because neither of them has ever received notice under

6    the Digital Millennium Copyright Act.

7          THE COURT:  Neither of them filed the

8    notification?

9          MR. SILVERSTEIN:  No, neither of them filed a

10   counternotification, your Honor, because they never

11   received notice of any takedown in the first place and

12   that is because the plaintiff has continually, and

13   without any basis in fact, attributed to Mr. and

14   Mrs. Shepherd actions that were undertaken by others.

15   Even if Barron or Wendy Shepherd had filed a DMCA

16   counternotification, such counternotification would not

17   have established personal jurisdiction in the

18   Commonwealth.  The Digital Millennium Copyright Act

19   provides that the party filing a counternotification

20   consents to the personal jurisdiction of the Federal

21   District Court in his district, not in --

22         THE COURT:  Where his address is?

23         MR. SILVERSTEIN:  Correct.  Alternatively,

24   your Honor, as we noted in our motion, the action should

25   also be dismissed for failure to state a claim.  The

plaintiff has only made bald assertions and legal

conclusions that do not warrant any relief on any theory

of law.  Specifically the plaintiff has failed to

properly plead a claim for copyright infringement.

A properly pleaded claim must allege four things.

Number 1, which specific or original works are the

subject of the claim.  Number 2, that the plaintiff owns

the copyright in the works.  3, that the copyrights have

been registered in accordance with the Copyright Act.

And, 4, by which acts and during what time the defendant

infringed on copyrights.

THE COURT:  And what do you rely on as

authority for that?

MR. SILVERSTEIN:  We rely on **ABC vs. Flying

Jay**, it's a Southern District of New York case from

2007.

THE COURT:  Because I think the cases are

mixed on how specific a pleading has to be to properly

allege a copyright violation.  But if I do dismiss

without prejudice, I'm going to direct the plaintiff, if

he wants to try this again, to allege with specificity

the facts that are necessary to establish personal

jurisdiction and to provide fair notice of what

copyrighted works are allegedly infringed, by whom, and

how.

1          MR. SILVERSTEIN:  I understand.

2          THE COURT:  Go ahead.

3          MR. SILVERSTEIN:  Your Honor, the plaintiff

4    hasn't alleged any of those four elements, let alone all

5    of them, in his complaint.  In his complaint, the

6    plaintiff sets forth just a broad allegation that

7    Ms. Shepherd has infringed upon plaintiff's copyrighted

8    materials without describing which materials had been

9    infringed, without establishing ownership of the

10   copyrights, without providing evidence of a valid

11   registration, and without explaining by which acts and

12   during what time such infringement allegedly took place,

13   and as such none of his claims can stand.  I would also

14   like to point out that in his opposition to

15   Ms. Shepherd's motion, the plaintiff did not contest

16   Ms. Shepherd's motion based on failure to state a

17   claim.

18        Your Honor, for all of these reasons, Barron and

19   Wendy Shepherd ask the Court to grant their motion and

20   to dismiss with prejudice all claims against them.

21   Thank you.

22          THE COURT:  Mr. Aguiar, is there more you'd

23   like to say about the Shepherds --

24          MR. AGUIAR:  Yes, your honor.

25          THE COURT:  -- based on what's in the record?

1     MR. AGUIAR:  I hope so.

2        Your Honor, I know that they have a website, "Bad

3   Ass Fightware," and it's a lot like other websites, it's

4   open in commerce to the world.  So therefore they do

5   have some jurisdiction up here in Massachusetts.

6           THE COURT:  No, they might as a result of

7   that, but --

8           MR. AGUIAR:  Also, regarding the e-mails, your

9   Honor --

10          THE COURT:  Well, let me put it this way.  The

11  -- well, go ahead.  Go ahead.

12          MR. AGUIAR:  If you'd like to speak, it's

13  okay.

14          THE COURT:  No.  Thank you.

15          (Laughter.)

16          THE COURT:  Go ahead.

17          MR. AGUIAR:  Your Honor, the website is

18  therefore registered to Wendy Shepherd.  That's the most

19  how she's involved with this situation.

20       When it comes to the e-mails, there was a slew of

21  about, I'd say, 10 e-mails or so, okay, including about

22  three phone calls where Mr. Shepherd asked to buy my

23  stuff -- actually, harassed me a little bit to a point

24  where I just stopped answering his e-mails.  He wants to

25  buy my stuff.  He can do things better.  He can use the

1    stuff and give it back to me.  Every excuse under the

2    sun.

3        I asked him, "Hey, are you related to the Ashida

4    Kim, because anybody that usually comes to me with a

5    deal" -- and, believe me, I get about five deals a

6    month, okay, to buy my stuff, to use my stuff, and I

7    usually tell them "No."  Um, after that I started seeing

8    things poke up with the video and things along those

9    lines.  He politely said "No."  He told me he wasn't, in

10   fact, associated with the Ashida Kim, although their

11   addresses are within two blocks from each other.  And

12   that's definitely in some of my motions.

13       Um, let me see.  Regarding the video, your Honor.

14   The video that the Shepherds obtained is a raw footage

15   video of my copyrighted works.  I own the original 8

16   millimeters of that work.  Sometime before my father

17   died, and I estimate in the late '80s, my father made

18   two copies of this video, aside from the original 8

19   millimeter.  Okay, one is in beta form, one is in VHS,

20   just in case something ever happened, to preserve this

21   video.  This video is the only existing video of Count

22   Dante doing what he's doing.

23           THE COURT:  What's he doing?

24           MR. AGUIAR:  He's executing poison hand

25   techniques and he follows into the Dance of Death and

some of the techniques that go along with that.  They

basically go, hand for hand, with the books that are

copyrighted.

       With that I guess Mr. Shepherd bought a rough

footage of the video with no user agreement whatsoever.

              THE COURT:  User agreement with who?

              MR. AGUIAR:  From what I understand, with the

Shepherds, Mr. Creeden and the Shepherds.  With no user

agreement.

              THE COURT:  But you haven't sued Mr. Creeden

for infringing?

              MR. AGUIAR:  I haven't.  Your Honor, I haven't

yet.  With that being said, your Honor, I don't feel he

has the right to actually use the video because it's

copyrighted under my copyright and he had no user

agreement.  That would essentially be like selling

somebody a regular movie that was in -- among the 5 cent

shelf and, you know, somebody trying to make a video out

of that.

       Um, between the different jurisdictions, I feel

like we have enough to hold him here.  With the DMCA

takedown, you know, as I said, I have to file in

Massachusetts.  When they filed a counternotification,

the one I received, their names were, in fact, on it.

The last signature on the bottom, I believe, was Ashida

Kim, which is a pen name.  It's not even a real name.

So, therefore, somebody received something.

They sent it back, because I got a copy of it in

my e-mail.  The videos went back door underneath the

Shepherd's YouTube account and then I had to file in

Federal court regarding the YouTube videos and the

original footage and all those kinds of things.  And

those videos, again, were selling memberships, were

selling everything with my logos including -- I would

even say franchises, if you will, and things along those

lines.  So I feel that between all of these things, I

definitely have jurisdiction and I feel we should keep

him in Massachusetts.

THE COURT:  Okay.  Thank you.  Well, I studied

the submissions before we came in.  The arguments have

been helpful.  As I said, the law that I'll describe in

more detail requires that I rely on information that's

properly been submitted to the Court and to Mr. Aguiar's

adversaries in deciding this matter.  A number of things

that Mr. Aguiar said are not in the record before me,

they may or may not be true, and I neither -- the

defendants nor I, have had a chance to consider the

implications of them.

So I'm going to rule on the -- based on the

information liberally construed, because Mr. Aguiar's

representing himself, but the information properly

before me, the inferences that could be drawn, and for

the reasons I'll describe in some detail, the motions to

dismiss for lack of personal jurisdiction of Wendy

Shepherd, Barron Shepherd, and Radford Davis, also known

as Ashida Kim, are hereby allowed.  But I'm dismissing

without prejudice.  And that means that Mr. Aguiar,

through counsel or on his own, can, if he wishes, try

one more time to establish personal jurisdiction against

these defendants, and before we leave today, I'm going

to give you a deadline for doing that.  I doubt it will

be as long as 90 days.

But, Mr. Aguiar, it's very important that you

understand this because if you, or any attorney on your

behalf, makes factual allegations with regard to the

defendants who have been dismissed, or indeed Mr. Webb

as well, that don't have a likely evidentiary basis --

in other words, there's not likely to be evidence to

prove those allegations or there's no legal basis for

them, you can be sanctioned under Federal Rule 11 and

the sanction can include having to pay for all of these

lawyers, which is expensive, and there could be other

sanctions as well.

However, as I said, the motions to dismiss of the

three defendants, other than Mr. Webb, are hereby

allowed, the personal jurisdiction cases against them
are dismissed without prejudice.

The most commonly-used method for determining a
motion to dismiss for want of personal jurisdiction is
for the District Court to consider only whether the
plaintiff has proffered evidence that, if credited, is
enough to support findings of all facts essential for
personal jurisdiction.  This is the so-called prima
facie standard as described in *Boit*, 967 F. 2nd 671 at
674 to 75.  It's the standard that I've used here.

As the First Circuit said, a prima facie showing
of personal jurisdiction must be based on evidence of
specific facts set forth in the record.  The plaintiff
must go beyond the pleadings and make affirmative
proof.  The plaintiff may not rely on unsupported
allegations in his pleadings to make a prima facie
showing of personal jurisdiction.

Personal jurisdiction also needs to exist under
the Massachusetts long-arm statute, Mass. General Law
Chapter 223(a), Section 3, and satisfy the requirements
of due process.  As I understand it, essentially the
long-arm statute is co-extensive with the limits of due
process.

Mass. General Law, Chapter 223(a), Section 3
states:  "A court may exercise personal jurisdiction

over a person who acts directly or by an agent as to a
cause of action in law or in equity arising from the
person's (A) transacting any business in this
Commonwealth, (B) contracting to supply services or
things in this Commonwealth, (C) causing tortious injury
by an act or omission in this Commonwealth, (D) causing
tortious injury in this Commonwealth by an act or
omission outside this Commonwealth, if he regularly does
or solicits business or engages in any other persistent
course of conduct or derives substantial revenue from
goods used or consumed for services rendered in this
Commonwealth."

First, with regard to all three defendants, I find
that personal jurisdiction does not exist under the
Digital Millennium Copyright Act, 17 United States Code,
Section 512(c).

Looking at the record generously to Mr. Aguiar, it
appears that he sent notifications to YouTube of a video
hosting website pursuant to 17 United States Code,
Section 512(c), a provision of the Digital Millennium
Copyright Act.  His notification asserted that the
videos hosted by some of the defendants infringed his
copyrights.  YouTube responded by disabling access to
the videos.

I thought that, in response, Barron Shepherd,

1     Davis and Webb separately allegedly issued

2     counternotifications to YouTube that their videos were

3     not infringing pursuant to 17 United States Code,

4     Section 512(g).  I'm told today that the Shepherds did

5     not file such a counternotification because they never

6     received the notification.  That dispute is not

7     material.

8           As part of the counter -- any counternotification

9     a defendant would have received, he or she would have --

10    under the Act, have been required to provide her name,

11    address and telephone number in a statement that he or

12    she consents to the jurisdiction of the Federal District

13    Court for the judicial district in which the address is

14    located.  That's 17 United States Code, Section

15    512(g)(3)(d).  In his papers, Mr. Aguiar argued that by

16    submitting these counternotifications, the defendants

17    consented to be sued in the district where he's located,

18    the District of Massachusetts.  This reflects a

19    misunderstanding of the statute.

20          The statute requires consent to personal

21    jurisdiction in the Federal District Court in the

22    judicial district in which the user's address is

23    located.  Therefore, Webb consented to be sued in

24    Illinois and if they received notifications, the

25    Shepherds would have consented to being sued in Indiana

and Davis in Florida.  None of them consented to being
sued in Massachusetts pursuant to the
counternotification provisions of the so-called DMCA.

No prima facie case of personal jurisdiction over
any of the three defendants other than Webb has been
made.  The plaintiff, in his complaint, makes really the
barest of general allegations.  In Paragraph 7, he
alleges that the defendants infringed plaintiff's
copyrighted materials and caused severe financial
damages.  This may not satisfy even the notice pleading
requirements of Federal Rule of Civil Procedure 8, but
the plaintiff has failed to provide the kind of support
for allegations that might support a finding of personal
jurisdiction with regard to the three defendants who can
test personal jurisdiction.

With regard to Wendy Shepherd, essentially no
facts are alleged and none are supported by an affidavit
or other information that goes beyond the minimal
allegations in the complaint.  In response, however, in
her motion to dismiss and supporting declaration, Miss
Shepherd asserts that she's never conducted any
transactions in Massachusetts, has not offered or
contracted to offer services in Massachusetts, and does
not regularly conduct transactions with residents of
Massachusetts.  There is, therefore, no basis under any

1    provision of the long-arm statute for jurisdiction over

2    her.  Indeed, in his opposition to her motion to

3    dismiss, Aguiar did not argue that personal jurisdiction

4    was appropriate as to her, although he has today.

5        With regard to Barron Shepherd, looking at all the

6    pleadings, including those provided by the defendants,

7    the most that can be discerned under the prima facie

8    standard is the following.  Barron Shepherd communicated

9    with Mr. Aguiar with a view to getting licensing --

10   well, with a view to licensing the copyrighted

11   trademarks Mr. Aguiar has.  Those communications did not

12   result in a deal or a transaction.  Barron Shepherd did

13   buy video footage from Mr. Creeden in Massachusetts for,

14   I believe, $1,000.  These represent far fewer contacts

15   than were found to be insufficient to meet the

16   transaction of business test in Section 3(a) in

17   Massachusetts Supreme Judicial Court decisions such as

18   *Droukas*, D-R-O-U-K-A-S, *vs. Divers Training Academy,*

19   *Inc.*, 375 Mass. 149, and *Roberts vs. Legendary Marine*

20   *Sales*, 447 Mass. 86.

21       Therefore, as it hasn't been established even

22   under the low prima facie standard, the personal

23   jurisdiction over Barron Shepherd exists under Section

24   3(a).  Section 3(b) does not apply because, at least

25   according to the information in the record, Barron

1    Shepherd was not supplying goods or services in

2    Massachusetts.  Section 3(c) does not apply because

3    there are no alleged misrepresentations that he made.

4    And Section 3(d) does not apply because there's no basis

5    for finding that the purchase of video from Mr. Creeden

6    was tortious and, moreover, no evidence that Barron

7    Shepherd regularly does or solicits business in

8    Massachusetts.

9         With regard to Radford Davis, the pleadings

10   indicate that Mr. Davis allegedly infringed copyrights

11   held by Mr. Aguiar by selling books or videos containing

12   copyrighted materials through his website.  Mr. Davis

13   responds in his declaration that he's never been to

14   Massachusetts, has never offered or contracted to offer

15   services of any kind in Massachusetts, and disseminates

16   no advertising in Massachusetts.  He adds that he does

17   not own or lease property in Massachusetts, does not

18   have any bank accounts in Massachusetts, and does not

19   file tax returns in Massachusetts.  Davis does own two

20   websites on which he sells martial arts paraphernalia.

21   He asserts that from that website he sold seven books

22   and DVDs to people in Massachusetts totaling in revenues

23   $267.  He also represents that this constitutes less

24   than 1 percent of his sales and therefore he has not

25   done continuous and systematic business in

1    Massachusetts.

2         Again, the contacts established by evidence that's

3    properly before me are far less than found to be

4    inadequate in **Droukas** and related cases to invoke

5    personal jurisdiction under the long-arm statute.

6         Although this isn't very well developed in the

7    papers, as to the videos Mr. Davis allegedly placed on

8    YouTube, which are not specifically identified in the

9    record, even if they infringed some copyright owned by

10   Aguiar, they do not confer personal jurisdiction here.

11   YouTube is, undoubtedly, an active website as that term

12   "active website" is defined in **Zippo**, a case that may

13   apply here conceptually, but Davis does not operate that

14   site.  Barring any allegation that Davis specifically

15   targeted infringing videos at Massachusetts, it did not

16   constitute minimum contacts with Massachusetts.  That,

17   however, is an issue I'll get into more deeply if it's

18   properly presented and briefed in the future.

19        So as I said, the motions to dismiss of Davis and

20   the Shepherds are allowed, they're allowed without

21   prejudice, and before we leave I'll set a schedule for

22   the filing of any proposed amended complaint, which can

23   be examined to see if it's adequate with regard to

24   personal jurisdiction, among other things.

25        All right.  Now we should move to the motion for

1   preliminary injunction, which at this point applies only

2   to Mr. Webb since the other defendants have been

3   dismissed.

4        To obtain a preliminary injunction, the burden of

5   proof is on the plaintiff.  The Court's required to

6   weigh four factors.  The first is whether the plaintiff

7   has shown a likelihood of success on the merits.  The

8   second is whether the plaintiff has established an

9   imminent threat of irreparable harm in the absence of a

10  preliminary injunction.  The Court is also required to

11  balance the hardships of the plaintiff, if no injunction

12  is issued, against the hardships of the defendant, if

13  the requested injunction is ordered.  In addition, the

14  Court must consider the effect of the proposed

15  injunction on the public interest.

16       The Court of Appeals for the First Circuit has

17  said, on a number of occasions, the likelihood of

18  success on the merits is of primary importance.  In a

19  copyright case, usually irreparable harm is presumed if

20  a likelihood of success on the merits is shown, as the

21  First Circuit said in **Concrete Machinery**, 443 F. 2nd at

22  611, and a preliminary injunction is an equitable

23  remedy.  So I'm going to take the equities into

24  account.

25       Based on the evidence in the record, Mr. Aguiar,

 1    would you like to speak to your motion for a preliminary

 2    injunction against Mr. Webb?

 3            MR. AGUIAR:  Your Honor, Mr. Webb first

 4    contacted me around 2005.  He said that he was referred

 5    to me through Ashida Kim.  He and I had a couple of

 6    phone conferences with him with my attorney, at the

 7    time, John Francure.  Okay?  He wanted to use my

 8    archives, he wanted to use my copyrighted videos, I

 9    said, "Well, you need to have some kind of a user

10    agreement for releasing my stuff."  He refused.  I

11    politely told him, around 2005, "Well, you can't use my

12    stuff."

13       Shortly after those phone conversations, videos

14    started being aired on YouTube and throughout a bunch of

15    different websites.  Also, his website also had a lot of

16    infringing-types of pictures in his blog that are also

17    from my books.  From there I sent cease and desist

18    orders.  For the most part, I followed the letter of the

19    law, using Mr. Francure.  I filed a DMCA also with

20    Mr. Webb.  I filed a counternotification basically

21    saying he's misrepresenting my copyrights.

22       His website went back up.  I filed.  Um, for the

23    most part, your Honor, the copyrighted materials have

24    been -- are owned by me through probate.  He was asked

25    to cease and desist --

1          THE COURT:  I looked at this morning, and I

2    want to make sure we're talking about the same thing,

3    you're talking about the so-called trailers that were on

4    YouTube that are advertising the movie that Mr. Webb

5    hopes to make?

6          MR. AGUIAR:  Yes.

7          THE COURT:  And what are the -- you say he's

8    using your books, too?

9          MR. AGUIAR:  There are numerous pictures in

10   both books -- from both books, I should say, on his

11   blog, on his website, in different places.

12         THE COURT:  Okay.  So it's -- you're

13   complaining -- I just want to understand what the

14   allegations are against Mr. Webb.  Am I correct that

15   you're complaining that he's using some photographs from

16   the copyrighted book or books on his trailers, video

17   trailers that you can get on the Internet, right?

18         MR. AGUIAR:  Essentially, your Honor --

19         THE COURT:  No, just listen.  I'm just trying

20   to figure out, you know, what I need to focus on.  So

21   one of your claims -- am I correct that one of your

22   claims is he's taken some full photographs which are in

23   copyrighted books and put them on those trailers?

24         MR. AGUIAR:  Yes.

25         THE COURT:  And then there's another one of

your claims that he took clips from your copyrighted

videos and put those on the trailer, too?

MR. AGUIAR:  Yes.  Right.

THE COURT:  Is there anything else?

MR. AGUIAR:  Essentially it's the heart and

soul of the copyrighted works.  Everyone buys my

production to see Count Dante doing what he does.  It's

the only footage of it in existence.  It's the meat and

potatoes of my production.  You know, he was asked to

take it down until we get a user agreement, something

tangible, and he refused, and that's why I pushed

forward with this cease and desist orders and things

along those lines.  When Mr. Webb was noncompliant with

all of that, I pushed forward to have his website

knocked down.  He filed, I believe it was, copyright

misrepresentation that I did that and he got his website

back up.  This is one of the reasons why we're here

today.

Your Honor, essentially I'd like to see -- if I

lose my video now, if I lose my footage now, I'll never

get it back.  I'm hoping to keep it under --

THE COURT:  Keep it under what?

MR. AGUIAR:  I'm hoping to keep it within my

reigns.  He doesn't have any permission to use my

footage.  He's using the whole "Dance of Death."  Not

only the video footage, but in the back of the book --
and this is the original book, and there's other
pictures, too, from both, he uses basically the entire
27 parts, which also is pretty much what Ashida Kim has
used, also.  My book's the slightly older one, but it's
also in the back of that.  There's very few pictures
that have changed and because of our '86 Amendment,
that's why we've changed and modified a few books.

Essentially he's had every chance in the world to
work with me, your Honor.  I'm not the bad guy I'm made
out to be on the Internet.  I actually don't mind some
of this stuff, but --

THE COURT:  You don't mind?

MR. AGUIAR:  I don't mind somebody coming to
me and working with me fairly, but he wanted everything
for nothing.  He didn't even want to sign a contract.
He talks about $10,000 I mentioned.  On his website,
that story changed three times.  Okay?  What I really
essentially wanted was something to hold our agreement
between us and he refused and he did what he wanted to
do, regardless of me following the law and using
Attorney Francure.

Essentially he's been noncompliant with all the
law.  He told the websites that I misrepresented my
copyright.  Nevertheless, I have the original works,

```
 1    some of the original pictures, some of the original -- I
 2    believe the original -- the original, um, negatives,
 3    probate, you know, I have it all.  How is it not mine?
 4        The fact of the matter is, your Honor, is he just
 5    wanted to do what he wanted to do.  I contacted him over
 6    a year and a half between once a week and four times a
 7    month, okay, from my lawyer's office.  At least I have
 8    an official witness.  And I'd either get a call back or
 9    there would be no calls again --
10            THE COURT:  Let me ask you this.  Is this in
11    the materials you gave me?
12            MR. AGUIAR:  I believe it is.
13            THE COURT:  Where?
14            MR. AGUIAR:  I'm not sure, your Honor.
15            THE COURT:  Because this is not ringing a bell
16    with me.  Go ahead.
17            MR. AGUIAR:  Essentially I followed the letter
18    of the law, I spoke to him a few times, and he basically
19    and publicly and here and there, on the phone with
20    Mr. Francure, said that if I don't like it, I can sue
21    him, and so I sued him.  I own it.  I can show the
22    timeline all the way back, almost to the first time that
23    we signed the original copyright.  I didn't mind working
24    with him at first.  I would like to see it all down to
25    the end of this -- or me and Mr. Webb's case.
```

1          THE COURT:  I'm sorry.  You would like to see

2     what?

3          MR. AGUIAR:  I would like to see it all down,

4     you know, everything, start with my infringing videos

5     until the end of --

6          THE COURT:  This case.  Okay.  Thank you.

7     Would you say your name, please, for the record.

8          MR. FALZONE:  Anthony Falzone for the

9     defendant, Floyd Webb, your Honor.

10        Your Honor, the discussions, whatever they were

11    between Mr. Aguiar and Mr. Webb, are beside the point.

12    Likewise, the takedown notices and the cease and desist

13    letter is beside the point on the issue before your

14    Honor and that is whether there's a basis to issue a

15    preliminary injunction.  Here there simply isn't any.

16        I think the reasons are laid out clearly in our

17    papers.  I won't belabor them all here.  But I do want

18    to speak directly to the ownership issue that has come

19    up time and time again that Mr. Aguiar raises here now.

20    The ownerships of the copyrights asserted here are very

21    much in doubt, your Honor.

22        As a threshold matter, the vast bulk of materials

23    Mr. Webb used in both the trailer and the website were

24    drawn from sources completely independent of any other

25    copyrighted works Mr. Aguiar asserts here and that's

1   laid out, item by item, in Mr. Webb's declaration

2   submitted to the Court.

3      Now, he does acknowledge that he used four

4   photographs from the original 1968 "World's Deadliest

5   Fighting Secrets" book and so the ownership of that book

6   is very much important here, your Honor, and although

7   it's a little difficult to trace, step by step, how

8   exactly it is that Mr. Aguiar came to own those

9   copyrights, I have a demonstrative I'd like to share, if

10   the Court would find that helpful?

11      THE COURT:  Well, (A) I have to -- I think

12   this, again, is something you didn't give me before, but

13   I understood from the submissions that one issue

14   relating to whether Mr. Aguiar is likely to prevail on

15   the merits is that you're challenging whether he

16   actually has a copyright?

17      MR. FALZONE:  Absolutely.  The 1968 copyright

18   was issued to The Count Dante Chicago Black Dragon

19   Fighting Society.  Although Mr. Aguiar asserts that he

20   inherited it from his father, there are several gaps

21   that have to be bridged on the road from the original

22   register of the copyrights to Mr. Aguiar.  He simply has

23   not bridged those gaps, your Honor, and presents no

24   proper basis for your Honor to conclude he owns the

25   copyrights in the original --

1          THE COURT:  Is it your claim that his father

2     didn't own them?

3          MR. FALZONE:  We don't believe he did.  And

4     even if he asserts he did, he has not presented the

5     proof necessary for the Court to so conclude.

6          THE COURT:  What's your next argument?

7          MR. FALZONE:  Your Honor, as to the ownership

8     of the video, that's actually not in dispute.  In both

9     his declaration to the Court and his reply memorandum,

10    Mr. Aguiar acknowledges that video was shot by John

11    Creeden, Jr.  He would be the presumptive author of that

12    video and owner of the copyrights.  And, indeed,

13    Mr. Aguiar acknowledges that John Creeden, III,

14    I believe, as, quote, "owns the video."  So there is,

15    again, no basis for the Court to conclude that

16    Mr. Aguiar has any valid copyrights to that video.

17         Now, ownership aside, even if he overcomes these

18    barriers to showing ownership, the fair use question

19    here is, I submit to your Honor, open and shut.  I'm

20    happy to address that now, although I think it's laid

21    out clearly in the papers.

22         THE COURT:  Okay.  Well, you've been waiting

23    to make your argument, so I want to give you a chance.

24         MR. FALZONE:  If it's reiterating what your

25    Honor has already studied, I'm happy to forego it.

1          THE COURT:  No, go ahead.

2          MR. FALZONE:  Thank you.

3      As a threshold matter, the Court has to be careful

4  in issuing a preliminary injunction here because this is

5  Mr. Webb's free speech rights that are at issue.  The

6  *Campbell vs. Acuff-Rose* case submits that and so does

7  the *Suntrose* case out in the Eleventh Circuit.

8      If you turn to the four factors that were

9  statutory factors and how they apply here, I think they

10  line up solidly and clearly in Mr. Webb's favor.

11  There's a significant line of cases that teach the use

12  of copyrighted materials as artifacts to tell a

13  biographical story, which is a transformative use, that

14  *Bill Graham* case from the Second Circuit.

15          THE COURT:  But, actually, I thought in *Bill*

16  *Graham*, the Second Circuit noted that:  "DK has not used

17  any of BGA's images in its commercial advertising or in

18  any other way to promote the sale of a book," but I

19  thought here that Mr. Webb was using the disputed

20  materials in these trailers to advertise the film he

21  hopes to make and actually ask people to donate money to

22  the making of the film.  Doesn't that distinguish the

23  two cases?

24          MR. FALZONE:  I don't think it does, your

25  Honor.  I think the trailers are audio/visual works that

1   stand on their own.  They are, in and of themselves,

2   miniature biographies of Count Dante.  And I think that,

3   just standing in and of themselves, regardless of

4   whether there's a film on the way, they serve exactly

5   the same purpose as the posters in **Bill Graham** and that

6   is to illustrate the story of this man's life.

7        Now, the critical thing to focus on here, your

8   Honor, is, yes, the trailer is, in some measure, to

9   generate interest in the film.  The film is about Count

10  Dante and so, consequently, there must be some latitude

11  to use, in the trailer, materials concerning Count Dante

12  to serve that biographical purpose.

13       THE COURT:  So basically your argument is, I

14  think, and I want to see if I understand it, is that

15  what Mr. Aguiar says he's got a copyright in, including

16  this book, "The World's Deadliest Fighting Secrets,"

17  teaches people Count Dante's moves, but Mr. Webb's work

18  is aimed at teaching people about Count Dante's

19  biography and that's different.  It's, in the words of

20  the Supreme Court, transformative.

21       MR. FALZONE:  I think that's it absolutely,

22  your Honor, but there's even more to it than that.  And

23  I think this is where the **Nunez** case comes in and is

24  instructive here.  You have to look at the constituent

25  elements, the photographs that were used, and insofar as

Mr. Webb uses publicity photos, the **Nunez** case discusses

those, and it found that using a photograph for a news

purpose is different than using a publicity photograph

for a publicity purpose, and I think that provides

further support for the transformation.

THE COURT:  How does it do that?

MR. FALZONE:  How does it do what?

THE COURT:  How does it do that?  Are you

saying that this is like news?

MR. FALZONE:  Well, it highlights the

transformativeness of the purpose.  The idea here is to

educate the public about Count Dante's life and

certainly not to teach karate, as I understand the

purpose of "The World's Deadliest Fighting Secrets" book

and video to be.

THE COURT:  Okay.  What about the other fair

use factors?

MR. FALZONE:  Sure.  The second factor, your

Honor, the nature of the copyrighted work winds up, if

on anyone's side, on Mr. Webb's side.  The material used

here is used in its factual capacity, that is, as an

artifact from the life of Count Dante.  And so it's not

something that is presented like a Richard Avedon

photograph that is there for its aesthetic merit, it was

taken presumably to further the purpose of teaching

1   karate, not a creative artistic purpose that might

2   generate maximum protection.

3           THE COURT:  Well, why isn't a book to teach

4   karate creative?

5           MR. FALZONE:  Well, it may very well be, but

6   the manner in which it's used, it's used to teach a

7   skill, to teach a skill, that is a -- although there may

8   be some creative element, it's very much utilitarian.

9   In fact, as I examine the website for Mr. Aguiar and

10  other folks, it's very clear that the thrust of all of

11  this is that this is deadly stuff, you learn this to

12  protect yourself and to use against somebody else.  This

13  is not artistic expression and the like that --

14          THE COURT:  Does "creative" mean artistic

15  expression?  Does "creative" mean that you didn't just

16  take the elements and throw them there, but you put them

17  there in a way that creates something where the value is

18  more than the sum of the parts.  If you just looked at

19  one of these pictures, it probably wouldn't teach you

20  much about a martial arts movie, but if you look at the

21  pictures in the context of the book, it has some

22  instructive value that it wouldn't have independently.

23  I thought that was "creative"?

24          MR. FALZONE:  Well, even if it were, your

25  Honor, one of the things the **Bill Graham** case does teach

1    is that when even a creative work is used in a very

2    transformative fashion, the second factor weighs in

3    favor of its factual capacity.  So on the spectrum of

4    creative versus factual works, I think this falls

5    clearly on the factual side, but maybe there's some

6    small creative component.  I don't think that changes

7    the way the factor ultimately weighs.

8         Turning to the third factor, it is true that yet

9    the full photograph was used in each case, but that's

10    not the same thing as saying the whole copyrighted work

11    was used because, of course, here the copyrighted work

12    is the whole book.  Any time you focus just on the

13    photographs themselves, your Honor, the **_Nunez_** case,

14    among others, instructs the Court that, for certain

15    purposes, using the whole photograph was just fine.

16         Finally, market effect, your Honor.  There's just

17    been no showing whatsoever that there's any effect here

18    on the sales of the video and nor could there be any

19    cognizable showing.  Again, the **_Bill Graham_** case is

20    instructive when you have a very transformative use.  If

21    anything, the defendant's work occupies what the Second

22    Circuit calls a "transformative market."  And even

23    effect on that market, and that's shown here, would not

24    be cognizable under the fourth factor or the second.

25         THE COURT:  Okay.

1          MR. FALZONE:  I do want to speak very briefly

2    about trademark issues, your Honor.  First and foremost,

3    I don't understand there to be any trademark claims in

4    this case now against my client.  I think Mr. Aguiar

5    made that crystal clear in his reply papers.  He said it

6    no less than four times.

7          THE COURT:  That's my present understanding

8    that right now this is a copyright case exclusively.

9    Right, Mr. Aguiar?

10          MR. AGUIAR:  Yes, your Honor.

11          MR. FALZONE:  In that case, your Honor, I

12    won't go into the representations about the validity of

13    the Black Dragon Fighting Society trademark, but as we

14    set out in the papers, it is, in fact, not a registered

15    mark.  And there wouldn't be a trademark claim to assert

16    anyway, contrary to what Mr. Aguiar has told you today.

17          THE COURT:  Okay.

18          MR. FALZONE:  Thank you, your Honor.

19          THE COURT:  Mr. Aguiar, would you like to

20    respond briefly?

21          MR. AGUIAR:  Yes, your Honor.

22        Your Honor, regarding the trademarks, for the most

23    part, the logos are on my copyrighted works.  So even if

24    they're not officially trademarked, they're still under

25    a copyright.  And besides that, the validity of my

copyrights, okay, and I know I submitted these, your

Honor, there is a transition of the original form.

After the death of Count Dante, in several public

magazines, and I do believe I submitted them, the majors

anyway that mention about Count Dante's wishes for my

father to take on the thrown and everything else, after

the death of Count Dante, there's essentially two or

three letters written out from Christa Dante, his

past -- the beneficiary. Okay? So it was a thing where

if someone contests my father's ownership, we have these

letters, okay, directly saying "user copyright,"

"copyrighted works," and I have the letters here, if you

can't find them there. And from there my father took

the copyrights and filed the 86. And the Library of

Congress won't copyright something if you don't own it

or have it transferred properly. From then on I did

receive -- I received it through probate, therefore I do

own copyrights.

Regarding the video, the video was never actually

ever released until 2000 and 2001, okay? My father is

in the video. It's a personal family video aside from

copyrighted.

Um, the four factors of fair use, your Honor, I

don't believe that Mr. Webb meets any of them. He did

not get permission from the owner. If he uses my

1    material, it will definitely be out of my hands.  It

2    will damage my works.

3            THE COURT:  It might actually enhance the

4    value of your works.  I had a case, 22 years ago,

5    ***Haberman vs. Hustler***, where I had to apply fair use as

6    it was then interpreted and one of the critical factors

7    in a finding of fair use was that a parodying of these

8    fine art photographs in "Hustler Magazine" was followed

9    by an increase in sales.

10           MR. AGUIAR:  Yes, your Honor, but once again I

11   would like to keep it within my restraints.

12           THE COURT:  Yeah, but that's -- it's a

13   somewhat different point.  But if a movie is made about

14   Count Dante and lots of people learn about him and are

15   interested, why shouldn't I think -- that's likely to

16   increase the demand for your books rather than diminish

17   it.

18           MR. AGUIAR:  But within the trailers, your

19   Honor, not only is the video there, but in the back of

20   the book he uses not just one picture, but pretty much

21   the entire "Dance of Death" in sequence.  We're not

22   taking one picture out and throwing it on a page or a,

23   "Hey, look at this," it's 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,

24   11, 12, right up to 27.  Okay?

25           Aside from that, your Honor, they're not following

the letter of the law.  I asked him to stop.  He didn't
have that permission.  He continued on.  I don't feel --
I feel like I'll never get this back.  It's going to
damage my works.  Maybe it might promote it a little
bit, but as far as I see it, I don't want it used.  I'm
hoping to keep this under all restraints, okay, it will
financially damage my works.  This is the only video of
Count Dante in existence doing this stuff, unless it's
in my file cabinet, your Honor, where I have more.

          THE COURT:  Okay.

          MR. AGUIAR:  I also own the original 8
millimeter film.  Okay?  Regardless of who claimed to
have shot it, I do believe that my Godfather, John
Creeden, Sr. -- my father and his father were -- and
John Creeden, III's father, my Godfather, were good
buddies.  They both knew Count Dante.  They both
experienced these thing together.  Okay?

    As it works, though, the original guy who
supposedly was behind the camera says "You can't use
it."  I have the original 8 millimeters.  I own it.

          THE COURT:  Who was behind the camera?  I
thought Mr. Creeden was behind the camera?

          MR. AGUIAR:  The original Mr. Creeden, the
senior.

          THE COURT:  I know, but --

1      MR. AGUIAR:  How do I even know that for a

2   fact?  I mean, that's what he told me.  I believe him

3   because, you know, they were very tight, they were

4   business compadres back in those days.

5      All in all, your Honor, I don't see where they

6   have any -- okay, one individual picture, you want to

7   use an ad, and he uses the ads, and he uses those

8   things.  This is fair use to cover something like this,

9   not the video footage with my father in it, not

10  consecutively 27 pictures that comprises the Dance of

11  Death, not video footage that he never actually got

12  permission for.

13     I believe one of the factors are that you should

14  get permission from the copyright holder or at least

15  attempt to.  I wanted to work with Mr. Webb.  He didn't

16  want to put anything on paper for me.  He wanted to do

17  what he wanted to do and he made his comments on the

18  phone or even on his blog, on his blog somewhere, maybe,

19  "If you don't like it, then sue me."  He doesn't follow

20  the four factors, whatsoever.

21     Since these videos went on YouTube and his

22  website, my sales went down a little bit.  I don't

23  really sell much of these anymore.  Why?  Because

24  they're seeing the only existing video.

25          THE COURT:  Where in the record am I told that

1　your sales have gone down?

2　　　　　MR. AGUIAR:  I don't believe I put that in

3　there.

4　　　　　THE COURT:  Yeah, I don't believe you did

5　either.  I have to decide this based on the evidence

6　that's properly before me.

7　　　　　MR. AGUIAR:  Okay.  I apologize.  But for the

8　most part, your Honor, with all of this happening, it

9　doesn't meet the four factors.  It will grossly ruin my

10　sales.  I'll lose control of my video with my father in

11　it.

12　　　　　THE COURT:  Yeah, I think you've said that and

13　I think I understand.

14　　　　　MR. AGUIAR:  There's other -- he uses several

15　pictures within "The World's Deadliest Fighting

16　Secrets," okay, not just one or two like his claims.

17　Um, and for the most part, the copyright always said

18　"No."

19　　　　　THE COURT:  Okay.  All right.  Thank you.

20　　　　　MR. FALZONE:  Your Honor, may I respond

21　briefly to that?

22　　　　　THE COURT:  Okay.

23　　　　　MR. FALZONE:  Very briefly.  I just want to

24　speak to ownership.  He's talking about relying on

25　magazine articles --

1          MR. AGUIAR:  No, I'm not actually.

2          MR. FALZONE:  -- as evidence of some kind of

3     transfer.  What he had provided to your Honor is a

4     purported 1977 sale of copyrights from some entity

5     called Cherry Productions to House of Dante, a Rhode

6     Island corporation.  He gives your Honor no proof that

7     the original copyrights registered to the Count Dante

8     Chicago Black Dragon Fighting Society were ever

9     transferred to Cherry productions.  Nor when he gives --

10    in addition, he submits what he purports as evidence of

11    transfer from the Fall River Black Dragon Fighting

12    Society to his father, but he doesn't provide the Court

13    with any evidence whatsoever that House of Dante, the

14    Rhode Island corporation, ever transferred to the Fall

15    River Black Dragons.  That is the problem with the

16    ownership here.

17         And as to the video, he acknowledges it's simply

18    not his.  He's clearly not the author.  And the fact

19    that his father and Mr. Creeden were good buddies,

20    doesn't make him the copyright owner.

21         MR. AGUIAR:  Your Honor, may I?

22         THE COURT:  No.

23         At the outset of the argument on the motion for

24    preliminary injunction, I recited the applicable

25    standards as I summarized them in ***Cablevision vs. Public***

1　***Improvement Commission***, 38 F. Supp. 2nd 46 at 53, and

2　noted that in a copyright case, usually a likelihood of

3　success on the merits is shown, irreparable harm is

4　presumed, as the First Circuit said in ***Concrete***

5　***Machinery***.  This is necessarily a preliminary

6　assessment, but for the reasons I'll describe, the

7　plaintiff's motion for a preliminary injunction is

8　hereby denied.

9　　First, I find that the required likelihood of

10　success on the merits, which the First Circuit has

11　characterized as the sine qua non for obtaining a

12　preliminary injunction, is not met.  There seems to be a

13　meaningful issue as to whether the plaintiff owns the

14　copyright and the photographs at issue.  For present

15　purposes, I assume he does.  It appears that Mr. Creeden

16　owns the copyright to the video, however.

17　　More importantly, on this necessarily incomplete

18　record, it appears that Mr. Webb is likely to prevail in

19　showing fair use.  As has been noted, there are four

20　primary, but not exclusive elements of fair use under 17

21　United States Code, Section 107.  The fair use inquiry

22　is primarily framed by four nonexclusive statutory

23　factors:  (1) The purpose and character of the use,

24　including whether such use is of a commercial nature or

25　is for nonprofit educational purposes.  (2) The nature

of the copyrighted work.  (3) The amount and substantiality of the portion used in relation to the copyrighted work as a whole.  And (4) The effect of the use upon the potential market for a value of the copyrighted work.

The courts give significant weight in the fair use analysis to whether the use of the copyrighted materials, here the video -- as to which Mr. Aguiar may not own the copyright, but I've analyzed it as if he does, and the photographs is transformative.  This concept was described by the Supreme Court in **Campbell**, 510 U.S. 569 at 579, and elaborated upon by the First Circuit in **Nunez**, 235 F. 3rd 18 at 21 to 22.  I find that within those definitions, these trailers, prepared by Mr. Webb, that incorporate the video and some photographs from the copyrighted book is transformative.

The plaintiff's book and the related video are used to teach martial arts skills.  The defendant's video is intended to educate people regarding Count Dante's life -- Count Dante being the person depicted in the book and on the video doing and teaching these martial arts skills.  But the difference between essentially teaching materials and biographical materials makes Mr. Webb's trailer, his proposed film,

transformative.  As something transformative -- and
because it's something transformative, that weighs
rather heavily on the side of a finding of fair use.

I haven't delved deeply into the definitions, but
I've actually assumed that the copyrighted book itself
is creative and that weighs in the plaintiff's favor.
In addition, the entire video clip is used and the
photographs are fully used, but they're only part of the
copyrighted book.  Again, I've assumed that this weighs
slightly toward the plaintiff.

While it's been argued by Mr. Aguiar today that
his sales have been going down, I have no affidavit, the
defendants have had no discovery, and as a practical
matter I have no evidence, which could have been
presented in the form of an affidavit, of harm to a
potential market for the copyrighted book, "The World's
Deadliest Fighting Secrets."  Rather, it seems to me, at
the moment, that it's more likely that a film on Count
Dante or this trailer will increase interest in him in
the market for books that display his ability.

In this sense, this case has the potential to be,
but I can't make a decision now, like **Haberman vs.
Hustler**, 626 F. Supp. 201 at 211 to 213, with the effect
on the potential market of a parodying of Mr. Haberman's
fine art photographs in "Hustler" magazine that actually

led to increased sales rather than decreased sales of
those fine art postcards. Since there's no showing of a
reasonable likelihood of success on the merits, there's
no basis to presume irreparable harm without a
preliminary injunction, nor is there any evidence of
irreparable harm before me.

I recognize that there's some potential hardship
to the plaintiff if, during the pendency of this case,
he loses exclusive control of the photographs that are
part of his book and the video, if he has the copyright,
but there's also -- would be a very significant hardship
to Mr. Webb if a preliminary injunction issued. The
injunction would prevent the trailer from being
broadcast and he would lose the opportunity to express
himself in this period.

In addition, the trailer both advertises and
solicits funds for a full movie that Mr. Webb would like
to make. The trailer, which I viewed this morning, and
it was put in evidence, said that the movie was going to
be made, I think, by May 2007. So evidently money
hasn't been raised or there's some other impediment to
finishing the movie.

But if Mr. Webb wants to make this movie, and at
the moment it appears it would be fair use to
incorporate some of the disputed materials in it, and

he's not allowed to be on the Worldwide Web trying to
raise money for the movie, that would be a hardship to
him.  And in the circumstances as they now exist where
it appears the use is fair use, delaying the film work,
killing the project, would harm the public interest.

The film is intended to educate the public about
Count Dante and would be creative.  I'm getting educated
to understand that there's interest in Count Dante.  In
general, courts don't decide whether some piece of art
or expression is valuable or not valuable, but we do
protect the creative process as a manifestation of
people's First Amendment rights.  The law generally
seeks to foster legitimate creativity and a preliminary
injunction in the circumstances of this case, as they've
been presented to me, would injure that interest.

All right.  Now, there's a motion to amend the
complaint to add "31 Studios" and motions to amend are
generally freely given, but the proposed amendment would
just add one line about 31.

MR. AGUIAR:  321.

THE COURT:  321?  Oh, then I misunderstood.
321.  I mean, I -- you know, as I said earlier,
Mr. Aguiar, what I'm inclined to do is to require that
you, alone or through a lawyer, file a new complaint.
If you look at Federal Rule of Civil Procedure 8, even

if you're Pro Se, still representing yourself, cases
like -- well, **Ahmed vs. Rosenblatt**, 118 F. 3rd 886,
require that you allege specific facts that if they're
true would give me jurisdiction or power to hear a case
against a particular person and give the defendants, you
know, a fair notice of exactly what you're -- not
exactly, but, you know, generally what you're charging.
And you've been able to articulate this today.  It's not
like you don't know.  You just didn't put it down on
what you filed.  You know, if you put the facts down,
the alleged facts down, even if you don't have a lawyer,
then I can and will do a lot of work to figure out
whether you've got a claim in there.  But if you don't
put the alleged facts in there, you know, my law clerk
can't help you, I can't help you, and the defendants
can't figure out what they have to answer.

So, you know, I've dismissed three of the
defendants without prejudice and I know you've been
listening to this carefully, but they really have to
have done enough in Massachusetts to make it fair under
the legal standards to require that they defend a suit
here and, you know, if you don't meet those standards, I
don't have the power to hear your case against them.

So my inclination, rather than to decide this
motion with regard to 321, which just says, I think,

that Mr. Webb owns 321 or something to that effect and
that 321 is going to produce this film, is, you know, to
give you a reasonable period of time, with a lawyer or
alone, to elaborate your allegations against Webb, to
specify in greater detail than you did in the motion to
amend any allegations you want to make against 321, and
to think very carefully about whether there's a proper
legal and factual basis to try to get any of the
dismissed defendants back in this case.  And if you're
wrong about them, you could end up paying for all of
their lawyers, as I've told you.

But, I guess, I'm interested in hearing from
counsel for Mr. Webb, who I assume would also represent
321, and Mr. Aguiar on that approach at this point, so
you get clearer notice of what you're charged with.

MR. FALZONE:  Well, first of all, your Honor,
I'm not at all sure we'd be representing 321.  As
Mr. Webb set forth in his declaration, 321 Studies had
nothing to do with this film whatsoever.  Given that
statement, it's hard to imagine how there could be any
proper basis to amend the complaint to bring 321 in as a
defendant.  So for that reason, again, although
amendments should be granted liberally --

THE COURT:  Well, on that, you see, I don't
grant a motion to amend if it's futile, but usually, you

1    know, that's like 12(b)(6), it fails to state a claim.

2    That if Mr. Aguiar alleges and then is prepared to offer

3    evidence that it would meet at least the prima facie

4    standard, that 321 is involved in this, you know, the

5    fact that Mr. Webb says, "No, they're not," probably

6    wouldn't get 321 out of the case, if he supported it the

7    way you have to under a prima facie standard.  But

8    anyway.

9              MR. FALZONE:  I understand, your Honor.

10             THE COURT:  But I'm just -- I mean, I could

11   also -- I mean, maybe you want to go ahead on the

12   present record.  You didn't move to dismiss.

13             MR. FALZONE:  So I think your Honor's

14   suggestion about greater specificity is a very good

15   idea.  In fact, that's what we asked for in terms of a

16   condition of an amendment.  Here we think it would be

17   very beneficial.

18        But I do want to speak to one thing that I think

19   is even more important from Mr. Webb's point of view and

20   that is moving this along quickly, and we'll probably

21   discuss that in respect to the CMC.  But although we

22   think this claim is meritless, it's casting a long

23   shadow, as your Honor identified, over his ability to

24   get funds for the film, to finish the film.  The BBC was

25   interested in the film, but said they didn't want to

1　touch it until this lawsuit is over.  So it's very

2　important for us to --

3　　　　　　　THE COURT:  So how do you think those two

4　interests get reconciled?  Part of my concern is that if

5　I -- well, maybe they're separate.  Are the claims

6　against Mr. Webb, can they proceed without knowing

7　whether these other defendants are in or out of the

8　case, Mr. Aguiar, from your perspective?

9　　　　　　　MR. AGUIAR:  Your Honor, from what I

10　understand, at least Barron Shepherd, Wendy being

11　attached to Barron with the website, your Honor, and

12　Ashida Kim, from what I understand, at least in the

13　beginning, they all got together and conspired with all

14　of this stuff to get this documentary up and going at

15　one point and in some manner.

16　　　　But what I was hoping, and maybe this is a little

17　premature, but I believe that there's a conspiracy for

18　my copyright, a conspiracy to defraud.  When it comes

19　down to 321 Studies, they are essentially the studio

20　that's producing the film.  So do I send them a cease

21　and desist?  What are my rights on that?  I added them

22　because they have a part to it.  They are part of the

23　overall issue.  So are the other defendants that were

24　dismissed, they all have a little piece in this, your

25　Honor.

1          THE COURT:  Well, my point is if -- you know,

2     you might find something out while you're doing

3     discovery with Webb that would give you a stronger case

4     against the others or it might persuade you they had

5     nothing to do with it.  But the issue is can the case go

6     ahead with regard to Mr. Webb before it's finally

7     determined whether the rest of them are in there?

8          MR. FALZONE:  Can I speak to that briefly,

9     your Honor?  Conspiracy or no conspiracy allegations,

10    the fact is that the alleged acts of infringement here

11    are completely separate.  So I think your Honor is right

12    to suggest that maybe these cases don't need to be

13    hitched together.  And I would submit to your Honor that

14    it might be prudent to simply sever the claims against

15    Mr. Webb and have them continue as a separate case.

16         THE COURT:  Well, the problem is -- well,

17    right now Mr. Webb is the only defendant.  The problem

18    is -- what are you proposing for discovery?

19         MR. FALZONE:  We want to finish discovery by

20    September of this year and we want to get before your

21    Honor for a trial, if there's going to be a trial, by

22    January of next year.  And in the meantime we think this

23    case would benefit by an early briefing schedule for a

24    summary adjudication motion --

25         THE COURT:  Well, I don't see -- I would

1    rarely take up a motion for summary judgment before the

2    end of discovery.

3             MR. FALZONE:  I understand.

4             THE COURT:  Rule 56(f) or something.  I'd have

5    to know what the evidence is before I can decide if

6    there are material facts in dispute.

7             MR. FALZONE:  Well, we're probably jumping

8    down into the case management conference, and I hope

9    that's okay with your Honor, but the suggestion is, for

10   instance, to bring an early summary adjudication motion

11   on the fair use issue.  The facts that would be in

12   dispute, if there are any in dispute, are fairly

13   limited.  The works are what they are and so

14   transformation doesn't turn on the facts that need to be

15   discovered, nor does the second factor, nor does the

16   third factor.  As to the fourth factor, it would seem

17   that most of the facts would be uniquely within the

18   plaintiff's control.  So I think that's a good candidate

19   for an early summary adjudication motion.

20            THE COURT:  I'm not sure.  Now, what are your

21   conversations with Attorney Goren -- who's Attorney

22   Goren?  Does he have background in copyrights?

23            MR. AGUIAR:  Yes, he does, your Honor.  Yes,

24   essentially regarding the three parties.

25        When the video was purchased from Mr. Creeden --

1          THE COURT:  No, I want to know about Mr. --

2          MR. AGUIAR:  Oh, I'm sorry.

3          THE COURT:  No.  Here's -- if you're going to

4    have a lawyer soon --

5          (Pause.)

6          THE COURT:  Mr. Goren said to go in and ask

7    for 90 days and that's not happening.

8          MR. AGUIAR:  I understand, your Honor.

9          THE COURT:  But what I may do, today being the

10   15th, is, say, to give Mr. Goren two weeks to decide

11   whether he's going to appear in the case and have

12   another conference shortly after that.  And if there's

13   some counsel who are out of town and want to, you can

14   participate by telephone.  Because, you know, if

15   Mr. Aguiar is going to get counsel, the case will

16   proceed one way, but if he's not going to get counsel,

17   it's going to proceed in another way.

18        So what I'm inclined to do is to give you two

19   weeks to, you know, either have counsel appear and, you

20   know, then counsel will participate in talking about

21   what he wants to do and how much time is necessary to do

22   it.  And I'm not saying they're going to have to file

23   anything in two weeks other than an appearance in the

24   case.  But, you know, if you're going to have to do this

25   by yourself, you know, the next time I see you, you're

```
 1   going to have to tell me, you know, whether you're
 2   asking for another chance right now to get the
 3   defendants in or you can go and do discovery with regard
 4   to Mr. Webb and then if you find something out that
 5   gives you reason to believe you have a proper basis to
 6   bring the other defendants in, you can make a motion and
 7   I'll see what to do.  It doesn't mean I'd let him, but
 8   --
 9             MR. AGUIAR:  All right.  But can I speak about
10   that right now?
11             THE COURT:  Well, here, let me just tell you
12   what I'm proposing.  That I would order that by February
13   29 you either cause new counsel to appear, counsel to
14   appear on your behalf, or you tell me that you haven't
15   been able to get a lawyer and you're going to continue
16   to do this yourself.
17             MR. AGUIAR:  Okay.
18             THE COURT:  And then I would have a
19   conference, let's see, I have an opening on March 6th.
20   So I would see you on March 6th and we'll see where we
21   go.
22             MR. AGUIAR:  Okay.
23             THE COURT:  Do you want to try to talk me out
24   of that?
25             MR. AGUIAR:  No, I would just like to comment
```

1    on -- I know you were asking me earlier about how you

2    can separate the three defendants?  Essentially, your

3    Honor, when --

4            THE COURT:  Well, hold on just a second.  What

5    about from Webb's perspective?

6            MR. FALZONE:  Your Honor, I think all of that

7    is a very good start in moving the case forward.  I

8    would also suggest to your Honor that in the meantime

9    there's no reason we can't set a deadline for any

10   amended complaint, too, so we make sure too much time

11   isn't --

12           THE COURT:  Well, the problem with that is I

13   don't know if Mr. Aguiar -- I mean, I can set a

14   deadline, but I might change it if he gets a lawyer.

15           MR. FALZONE:  Well, that's perfectly

16   understandable.  What I was going to suggest, your

17   Honor, is it would seem that one or two things is going

18   to happen, he'll either have a lawyer on the 29th or

19   not.  If he does, it would seem like two weeks is enough

20   time for his new lawyer to draft an amended complaint.

21   And if it turns out he doesn't have a lawyer, he should

22   be working on it in the meantime.  I see no reason why

23   we can't have an amended complaint in 30 days.

24           THE COURT:  There might or might not be, the

25   lawyer might say that he wants more.  And usually that I

1  wouldn't have the conference before I had the amended
2  complaint.  I wouldn't know who had to come to the
3  conference.  (Pause.)  But then I could push the
4  conference back.
5      I'm ordering Mr. Aguiar to either cause a lawyer
6  to appear by February 29th or tell me that he's going to
7  continue to represent himself.  I am going to conduct a
8  conference at 2:30 on March the 6th.  Anybody who's out
9  of town and wishes to participate by telephone, I may
10  permit that.  And if Mr. Aguiar is going to continue to
11  represent -- and I'm going to set a tentative date of
12  March 14th for an amended complaint to be filed.  And
13  I'll send you a written order on this, Mr. Aguiar, even
14  though it does make sense to write down the dates.  So
15  that's the date.
16      If you're representing yourself, you're going to
17  have to file an amended complaint by that date.  If a
18  new lawyer is going to represent you, that's the date
19  for present purposes.  But if he has a good reason, a
20  persuasive reason to get more time, then I'm going to
21  give him another week or so.  But I do think that it's
22  in your interest, because you're concerned that the
23  value of your property is being injured, that this
24  progress reasonably fast and it's in the defendant's
25  interest, too, because just the threat of being held

1    liable here apparently is having some injurious effect.

2       I think there's one other issue, the protective

3    order.  You all agree on the protective order, which is

4    okay, but while the copy I have isn't -- it's signed by

5    Mr. Aguiar, the copy I have isn't signed by anybody

6    else.  Oh, yes it is.

7       There's only one adjustment.  You've got Paragraph

8    11 here that talks about use at trial and the rules at

9    trial are different.  Things in discovery are not

10    generally publicly available.  The First Circuit case is

11    ***Anderson vs. Cryovac.***  But trials are presumptively open

12    proceedings.  Rather than try to deal with that now,

13    what I typically add to these orders when they're not in

14    there is that the Court reserves the right to modify

15    this order after giving counsel notice and an

16    opportunity to be heard.  That happens to be the law in

17    the First Circuit anyway.  But I'll put you on notice.

18    I'll adopt this order, but particularly if and when we

19    get to a trial, we'll have to have some careful

20    discussions about what's going to happen at trial,

21    because we don't conduct secret trials.

22       (Pause.)

23       THE COURT:  All right.  I'm going to want to

24    see counsel in the lobby for a few moments, but is there

25    anything else before we do that?  Anything else?

1          MR. FALZONE:  Well, we have the case

2     management conference statement and the dates we

3     proposed.

4          THE COURT:  Well, that's what we're going to

5     take up on March 6th.  I'm not going to set a schedule

6     for the case until I know whether Mr. Aguiar has a

7     lawyer or not and whether -- and you'll need to think

8     about all of this, Mr. Aguiar, and discuss it with

9     Mr. Goren or any other lawyer whether you think you're

10    going to try to bring these other folks in.  Right now

11    they're not required to come on March 6th because

12    they're not in the case.  But if they want to come, they

13    can.

14         MR. AGUIAR:  There is a connection between the

15    three of them, your Honor.

16         THE COURT:  Yeah, I know, but they're not in

17    the case now.  I've dismissed them.  And you're going to

18    have to think carefully about not just whether you think

19    you have a claim against them, but whether under the

20    standards I tried to explain, so you can understand them

21    today, it's permissible to bring the case against them

22    here.  You might have a case against them that you could

23    bring in Federal court in Florida.  I know you don't

24    want to go to Florida.  But I only have power to decide

25    cases against people as to whom there's personal

```
 1    jurisdiction in Massachusetts.  And whether there's a
 2    meritorious case and whether there's jurisdiction in
 3    Massachusetts are two different questions.  Okay?
 4              MR. FALZONE:  I would like to ask your Honor
 5    if there's any need to file a case management conference
 6    prior to the March 6th conference?
 7              THE COURT:  No, I don't think so.  Well, let's
 8    see.  Sure.  I mean if -- yeah, if Mr. Aguiar has a
 9    lawyer, let's say -- no, there's not much time.  You'll
10    find out on the 29th.  Let's say, you know, by March 5th
11    at 12:00 noon, jointly if possible, individually if
12    necessary, you'll file a proposed scheduling order.
13    But, you know, talk to each other.  Maybe you can reach
14    an agreement as to how it should proceed.  Okay?
15         If Mr. Aguiar doesn't have a lawyer, can you talk
16    civilly to each other and see if you can agree or
17    disagree on how the case should proceed?  You're not
18    going to send any nasty e-mails that might come to the
19    attention of the judge?  Okay?  What's that?
20              MR. AGUIAR:  There's that on both sides.
21              THE COURT:  I know.  But nobody looks good
22    when I read those things.
23              MR. FALZONE:  Your Honor, for what it's worth,
24    the conversations we've had with Mr. Aguiar have been
25    quite productive and he's been quite respectful, so I
```

1  don't think that --

2         THE COURT:  Okay.  Good.  Okay.  All right.  I

3  just want to try to make sure you don't try any of these

4  moves out on each other.  They look deadly.

5         (Laughter.)

6         MR. AGUIAR:  Your Honor, if it was one of

7  those things, they'd still need more people.

8         THE COURT:  All right.  The Court is in

9  recess, but I'll see you.

10         (Ends, 4:00 p.m.)

C E R T I F I C A T E

         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

do hereby certify that the foregoing record is a true

and accurate transcription of my stenographic notes,

before Chief Judge Mark L. Wolf, on February 15, 2008,

to the best of my skill and ability.

/s/ Richard H. Romanow
_____
RICHARD H. ROMANOW